**The PLESSEY COMPANY PLC, a British corporation, Plaintiff,**

v.

**The GENERAL ELECTRIC COMPANY PLC, a British corporation, Defendant.**

**Civ. A. No. 85–761 LON.**

United States District Court,
D. Delaware.

Jan. 16, 1986.

William T. Quillen (argued), John E. James, and Donald J. Wolfe, Jr., of Potter Anderson & Corroon, Wilmington, Del. (Seth H. Dubin, and Geoffrey H. Ward, of Satterlee & Stephens, New York City, of counsel), for plaintiff.

R. Franklin Balotti (argued), and Gregory P. Williams, of Richards, Layton & Finger, Wilmington, Del. (John R. Hupper (argued), and Rory O. Millson, of Cravath, Swaine & Moore, New York City, of counsel), for defendant.

## OPINION

LONGOBARDI, District Judge.

The General Electric Company plc[1] ("GEC") has made a tender offer in England for the stock of The Plessey Company plc ("Plessey"). Both companies are organized and doing business under the laws of Great Britain. The parties are before the Court upon Plessey's motion for a preliminary injunction and GEC's motion to dismiss.

### THE PARTIES

Plaintiff Plessey is one of the leading telecommunications and technology companies in Great Britain with annual revenues in excess of 2 billion dollars. It has operations in the United States which provide revenue in the area of 220 million dollars.

Although the vast majority of Plessey securities are traded overseas, there are three types of Plessey securities currently registered or exempted from registration in the United States pursuant to section 12 of the Securities Exchange Act of 1934 ("Exchange Act") and section 5 of the Securities Act of 1933 (the "1933 Act"). Docket Item ("D.I.") 1, p. 4. Plessey American Depositary Receipts ("ADRs") are registered se-

---

1. There is no affiliation between The General Electric Company, plc and General Electric Company in the United States.

curities which are traded on the New York Stock Exchange ("NYSE"). There are about 1.2 million outstanding Plessey ADRs which are held by approximately 3,000 persons throughout the United States. D.I. 1, p. 3. On December 9, 1985, there were 14 holders of Plessey ADRs in Delaware who held a total of 768 ADRs. Affidavit of Seth Dubin, D.I. 22, Exhibit C. Each Plessey ADR can be converted to Dollar Ordinary shares ("Dollar shares") and these Dollar shares can be converted to Sterling Ordinary shares ("Ordinary shares"). Dollar shares and Ordinary shares are not traded in the United States but are registered securities in the United States. Plessey Ordinary shares are identical to Dollar shares except as to the form of dividend payment.[2] D.I. 1, p. 4.

The parties agree that Dollar shares, ADRs and Ordinary shares are separate classes of Plessey stock. Plessey Opening Brief, D.I. 19, p. 1; GEC Memorandum of Law, D.I. 31, pp. 10–11; D.I. 22, Exhibit A, p. 1.

Defendant GEC is also a major telecommunications and high technology concern. Last year, its total revenues worldwide approximated 8.8 billion dollars with 1.2 billion dollars of that amount derived from its United States operations. GEC securities in the United States consist solely of GEC ADRs which are traded over-the-counter. D.I. 1, p. 3.

## STAGE OF PROCEEDINGS

The parties are before the Court because of the nature of the GEC takeover bid. GEC maintains that its takeover offer (the "Offer") is being made to all Plessey shareholders *except* those in the United States who hold ADRs or Dollar shares. As a result, GEC argues that it is not subject to United States tender offer regulation. GEC explains that it never sent its tender offer solicitation material to any United States shareholder (directly or indirectly) and, that under federal securities law, the

registration and reporting requirements of the Exchange Act and the 1933 Act are not triggered unless an instrument of interstate commerce is used by the tender offeror. GEC has moved to dismiss the complaint due to the Court's alleged lack of jurisdiction over GEC, lack of subject matter jurisdiction, improper venue, improper service of process and a variety of other procedural deficiencies.

Plessey argues that GEC made a tender offer in the United States on December 9, 1985 when it issued a press release in the United Kingdom which announced its imminent United Kingdom tender offer for Plessey. According to Plessey, publication of certain information contained in the press release by the United States media triggered the reporting and registration requirements of the United States securities laws. Plessey maintains that GEC failed to file the required prospectus and documents mandated by sections 14(d) and 14(e) of the Exchange Act, 15 U.S.C. § 78n(d) and 15 U.S.C. § 78n(e), and has, as a result, left United States Plessey ADR holders very confused about the status of their investments and how to tender their ADRs. To complicate matters, since December 3, 1985, when GEC issued its first press release announcing its proposed offer, the price for Plessey ADRs on the NYSE has risen dramatically. D.I. 22, Exhibit D. According to Plessey, the rise in the market price occasioned by the press release serves only to intensify the need of Plessey ADR holders for tender offer information which fulfills section 14(d) and section 14(e) requirements. Only then, concludes Plessey, can the Plessey ADR holders make a knowing and intelligent investment decision about their ADRs. Therefore, Plessey has moved the Court for a preliminary injunction to require GEC to satisfy Securities & Exchange Commission ("SEC") reporting and securities registration requirements under section 5 of the

---

**2.** Ordinary share dividends are payable in pounds sterling whereas Dollar share dividends are payable in United States dollars.

1933 Act and sections 14(d) and 14(e) of the Exchange Act.

## I. FACTS

On December 3, 1985, GEC issued a press release stating that it had proposed to Plessey "a combination of their two companies." D.I. 1, Exhibit A. At that time, GEC indicated that it had requested Plessey management to consider an offer which valued Plessey shares at 160p.[3] The press release did not specify the amount of securities GEC sought or what class of classes of Plessey securities GEC was interested in acquiring. The release is silent as to whether the proposed offer would be made to Plessey ADR holders in the United States.

Distribution of the December 3 press release to the London stock exchange was followed that same day by a press conference in GEC's offices in England. Deposition of Michael Lester, D.I. 27, p. 16. In attendance at that conference were representatives from the London press, BBC and ITV. Copies of the press release were given to those individuals and questions regarding the proposed combination were answered. Copies of the press release were also distributed by the GEC press officer to the London financial press. *Ibid.*, p. 16.

The Plaintiff has not demonstrated on the present record whether representatives of the United States press were in attendance at the December 3 press conference, but it is certain that the GEC press officer "was not instructed to tell journalists at the press conference not to send any material to the United States." *Ibid.*, pp. 22–23.

News of the GEC proposal to combine with Plessey reached the United States almost immediately. The Associated Press

and Dow Jones tape each distributed a story on the GEC proposal on December 3. D.I. 22, Exhibit E, pp. 1–2. The Wall Street Journal of December 4, 1985 contained a story entitled "GEC Offers to Buy Plessey For $1.79 Billion", *ibid.*, p. 3. Similarly, the December 4, 1985 edition of The New York Times contained a story discussing GEC's disclosure to purchase Plessey. *Ibid.*, p. 4.

Plessey's board of directors rejected GEC's merger proposal on December 4, 1985. The United States press reported Plessey's reply on December 4 through the Associated Press, The New York Times and Dow Jones tape and, on December 5, in The Wall Street Journal and The New York Times. *Ibid.*, pp. 5–8.

A significant change in the market price for Plessey ADRs occurred on the NYSE commencing December 3, 1985. The record before the Court reflects that prior to December 3, the closing price for Plessey ADRs on November 25, 1985 and November 26, 1985 was $22\frac{1}{4}$ each day. On December 3, 1985,[4] the market closed with Plessey ADRs valued at $25\frac{3}{4}$. December 3 also showed a new "high" for Plessey ADR's at 26. The prices of Plessey ADRs reached new "highs" on December 4 and December 6, when the prices were 27 and $27\frac{1}{4}$ respectively.[5] D.I. 22, Exhibit D.

GEC issued a second press release on December 9, 1985. The pertinent part of that press release is contained in its first paragraph: "GEC announces that it is today making an offer for Plessey of more than 160p per ordinary share, which values the company at approximately £1.18 billion. Full details of this offer are contained in the attached announcement by S.G. Warburg & Co. Ltd." [6] Affidavit of R. Franklin Balotti, D.I. 35, Exhibit F, p. 1. The

---

3. "p" represents "pence" in the United Kingdom currency system. In that system, 1 pound ("£") = 100p. On Tuesday, January 14, 1986, the conversion factor between United States dollars and United Kingdom currency was as follows: 1 pound = $1.45.

4. On the current record, no information is available as to the market closing price of Plessey

ADRs for the period November 27, 1985 through December 2, 1985.

5. December 7 and December 8 were weekend days when the NYSE is closed.

6. S.G. Warburg & Co. Ltd. ("Warburg") is GEC's London investment banker.

attached Warburg announcement ("Warburg press release") details the terms and conditions of the offer but refers to the status of the offer as only a proposal: "The Board of GEC proposes to make an offer (the "Offer") for the whole of the Ordinary share capital of Plessey...." *Ibid.*, p. 4. Additional preparatory language is found at the very end of the Warburg press release: "S.G. Warburg & Co. Ltd. will despatch documents containing the formal offer on behalf of GEC as soon as practicable." *Ibid.*, p. 9.[7]

The Warburg press release contains detailed information about GEC's takeover offer for Plessey. Specifically, it states the identity of the offeror (GEC), the identity of the offeree (Plessey), the amount and class of securities being sought and the price being offered for Plessey "Ordinary shares."[8] It also contains the following provisions which are material to disposition of the instant motions:

1. "The Offer will not extend to Dollar Ordinary shares of 25p each of Plessey ("Dollar shares") or to American Depository Receipts evidencing Dollar shares."

*Ibid.*, p. 5; and

2. "The Offer will be made for all the Plessey Ordinary shares in issue at the date on which the Offer is made and for all Plessey Ordinary shares which, while the Offer remains open for acceptance, subsequently arise or are allotted as a result of the exercise of options under the Plessey share option schemes or the conversion of Dollar shares including those arising upon the exercise of conversion rights attaching to the Plessey Inc. 4½% Convertible Subordinated Debentures[9] due June 1, 1993 ("the Plessey Inc. Debentures"). The Offer will not be made directly or indirectly in, or by use of the mails or by any means or instrumentality of inter-state or foreign commerce or of any facilities of a national securities exchange of, the United States of America, its possessions or territories or any area subject to its jurisdiction or any political sub-division thereof."

D.I. 35, Exhibit F, p. 5.

The December 9 press release was distributed by GEC to the London financial press. This included the Observer, The Sun Times, The Times, the Financial Times and The Daily Mail. D.I. 27, p. 25. The GEC press officer was given instructions by the company not to mail the press release to the United States. *Ibid.*, pp. 25–26. GEC also instructed Warburg not to send any copies of the Warburg press release to the United States. Affidavit of Derek Alan Higgs, D.I. 34, p. 6.

News of the press release did reach the United States shortly thereafter. On De-

---

7. GEC has acknowledged that its use in its press release of the definitive phrase "it is today making an offer" might be inconsistent with the proposal language found in the attached Warburg press release. Deposition of Michael Lester, D.I. 27, p. 92. GEC regards its own version as "technically inaccurate." *Ibid.*, p. 94.

8. "The Offer will be made by S. G. Warburg & Co. Ltd., on behalf of GEC, on the following basis: —

For every 4 fully paid          320p in cash
Plessey Ordinary shares

plus

1 new Ordinary share of 5p
of GEC ('a new GEC share')

plus

160p nominal amount of 7–3/4 per cent. Convertible Unsecured Loan Stock 2004 of GEC ('GEC Convertible Stock')  .

and so in proportion for any larger or smaller number of Plessey Ordinary shares."

9. Plessey, Inc. is a corporation organized under the laws of New York with its principal place of business in that State. Plessey debentures are convertible into Plessey ADRs. D.I. 1, p. 6. According to GEC, Plessey debentures are not registered securities under the Securities Exchange Act of 1934 and are not traded on any United States stock exchange. D.I. 31, p. 11, n. 3.

cember 10, 1985, the Wall Street Journal published a story entitled "GEC Sets the Terms Of Offer for Plessey." D.I. 22, Exhibit E, p. 24. That day's issue of The New York Times contained a similar story which stated the bidder's name, the target's name and the amount offered for each share of Plessey stock. *Ibid.*, p. 25. Neither news item made any mention of the press release provision which stated that "[t]he offer will not be made directly or indirectly in ... the United States" and "The Offer will not extend to Dollar Ordinary shares of 25p each of Plessey ("Dollar shares") or to American Depository (sic) Receipts evidencing Dollar shares."

News of the "offering" also reached the United States through a December 11 mailing by Plessey which directly or indirectly reached all United States holders of ADRs and Dollar shares. The Plessey mailing, however, contained *only* the Warburg press release. It did not contain the GEC press release. Affidavit of Warren J. Sinsheimer, D.I. 36, p. 2.

Plessey felt compelled to distribute the press release to its shareholders of record pursuant to United Kingdom rules regarding takeovers and mergers. The City Code on Takeovers and Mergers ("Code") provides as follows: "Promptly after the first announcement of an offer or possible offer, a copy of the press notice or a circular summarizing the terms and conditions of the offer must be sent by the offeree company to its shareholders ..." Affidavit of Graham Fenwick Pimlott, D.I. 20, Exhibit 1, Code, Rule 2.6. Also, "[d]uring the course of a take-over, or when such is in contemplation, neither the offeror, nor the offeree company ... may furnish information to some shareholders which is not made available to all shareholders." D.I. 20, Exhibit 2, Code, General Principle 2.

The Code requires only that an offeree (or possible offeree) distribute an offeror's "press notices" and "circulars" to its shareholders of record. D.I. 20, p. 2. At present, Citibank, N.A. is the sole record holder of Plessey Dollar shares and is the Depositary of Plessey ADRs. D.I. 21, p. 2, ¶ 6. Therefore, the United Kingdom Code required Plessey to send a copy of the Warburg press release only to Citibank. Plessey went a step further, however, and arranged to have the press release sent to all of its ADR holders. It did this pursuant to an existing contractual agreement with Citibank wherein Citibank, at Plessey's expense, "is required to mail to all holders of ADRs copies of all notices and other reports and communications which are made generally available by Plessey to holders of Dollar shares." D.I. 21, p. 2. The result of this maneuvering by Plessey was that it placed the December 9, 1985 press release directly into the hands of its United States ADR holders.[10] The parties appear to agree that under United Kingdom law the press releases of December 3 and December 9 were steps preliminary to the release of an official offer or "Offering Circular" required to follow within 28 days. It also appears that the parties agree that the procedure followed by GEC in England was done in accordance with British law and practice prescribed for takeovers.

The price for Plessey ADRs on the NYSE remained fairly constant and was apparently unaffected by the issuance of the Warburg press release on December 9.[11] The daily closing prices for Plessey ADRs through that period were December 6 (27¼), December 9 (27), December 10 (25¼), December 11 (26), December 12 (26), December 13 (26¾), December 16 (27), December 17 (26), December 18 (25¼), December 19 (25¾), December 20 (25½), December 23 (25). D.I. 22, Exhibit D. As can be seen, the closing price for ADRs actually declined on the date the Warburg press

---

**10.** Holders of Plessey ADRs received copies of GEC's December 3, 1985 press release and copies of Plessey's replies to GEC's overtures in a similar fashion. Affidavit of Warren J. Sinsheimer Affidavit, D.I. 21, p. 2 ¶ 8.

**11.** The period between December 9, 1985 and December 23, 1985 is significant because, as will be discussed later, a third communication regarding the tender offer was issued by GEC on the latter date.

release issued; the price declined even further the following day.

After GEC's December 9 press release was issued in London, both parties received inquiries from the United States regarding GEC's intentions. Plessey states that it received between 15–20 telephone calls, including one each from Dean Witter and Salomon Brothers. Deposition of Warren J. Sinsheimer, D.I. 26, p. 26. Most of the inquiries were believed to be from United States Plessey shareholders who stated "We're terribly confused. We don't know what to do. What is this all about? Are they going to buy our shares or aren't they?" *Ibid.*, p. 21. Plessey responded to the inquiries by stating that it did not know GEC's intentions and that "I [Plessey] was as confused as they were." *Ibid.*, p. 22.

GEC received two or three telephone calls from the United States regarding its December 9 press release. GEC responded to United States inquiries by instructing its press office "that the offer was not being made in the United States, the offer was not being made for Dollar shares or ADRs and the offer could not be discussed with any person in the United States." Affidavit of Michael Lester, D.I. 33, p. 7, ¶ 10.

No telephone inquiries regarding the December 9 press release were received from the United States by Warburg. *Ibid.*, p. 8, ¶ 11.

A third and final written communication from GEC regarding its intended acquisition of Plessey occurred on December 23, 1985. It distributed a document titled "GEC Offer for Plessey" ["Offering Circular"]. D.I. 35, Exhibits A–C. The parties agree that the December 23 Offering Circular contains the present terms and conditions of GEC's tender offer for Plessey securities. D.I. 1, pp. 6–7.

The document contains three sections, each of which fulfills a particular function. The first part, entitled "GEC Offer for Plessey" ("Offer"), contains background information and the terms of the offer. D.I. 35, Exhibit A. The second part, entitled "Form of Acceptance for use by Ordinary Shareholders of the Plessey Company plc ..." ("Form of Acceptance"), contains instructions for those who wish to accept the Offer. D.I. 35, Exhibit B. The final section, which is entitled "Listing Particulars —GEC" ("Listing Particulars"), provides a comprehensive analysis of the financial conditions of both GEC and Plessey. D.I. 35, Exhibit C.

## THE OFFERING CIRCULAR

Some provisions of the Offering Circular are particularly relevant to the issues before the Court regarding GEC's alleged violations of sections 14(d) and 14(e) of the Exchange Act. For example, all three sections begin with a boldface disclaimer that "[t]he Offer is not being made in, and this document must not be distributed into, the U.S.A."[12]

Aside from the initial disclaimers found in each of the three sections, the Offering Circular contains a variety of other qualifications and restrictions on the Offer. For example, it advises that "[t]he Offer is not being made directly or indirectly in, or by use of the mails or by any means or instrumentality of inter-state or foreign commerce or of any facilities of a national securities exchange of, the U.S.A." *Ibid.*, Exhibit A, pp. 13, 25. Also, with respect to rights of withdrawal under the Offer, it warns that "[n]o notice which is postmarked in, or otherwise appears to GEC or its agents to have been sent from, the U.S.A. will be treated as valid." *Ibid.*, Exhibit A, p. 23. Finally, the Offer contains the following significant language:

> [c]opies of this document, the Form of Acceptance, the Listing Particulars and any related offering documents are not being mailed or otherwise distributed or

12. To be technically correct, only the first two parts of the Offering Circular contain the quoted disclaimer found in the text. The Listing Particulars disclaimer states "[t]his document must not be distributed into the United States of America." D.I. 35, Exhibit C, p. 1.

sent into the U.S.A., including to Plessey shareholders with registered addresses in the U.S.A. Persons receiving such documents should not distribute or send them into the U.S.A. or use the mails or any such instrumentality in connection with the Offer, and so doing may affect the validity of any relative purported acceptance. Envelopes containing Forms of Acceptance should not be postmarked in the U.S.A. or otherwise despatched from the U.S.A. and all acceptors must provide addresses outside the U.S.A. for the receipt of securities, the remittance of cash or the return of Plessey share certificates. In addition, neither the new GEC shares nor the GEC Convertible Stock nor the GEC Loan Notes to be issued to acceptors of the Offer will be registered under the United States Securities Act of 1933, as amended. GEC will not authorise the delivery of any document(s) of title in respect of any new GEC shares, GEC Convertible Stock or GEC Loan Notes in the U.S.A. or to any person who is, or whom GEC believes to be, a U.S. person or who fails to make the declaration set out in paragraph 2, Part A of the Form of Acceptance to the effect that he is not a U.S. person, does not hold Plessey shares on behalf of a U.S. person and will not hold or acquire any of the new GEC shares or GEC Convertible Stock or GEC Loan Notes for the account or benefit of a U.S. person or with a view to the offer, sale or delivery, directly or indirectly, of any such securities in the U.S.A. or to U.S. persons. Accordingly, any Plessey shareholder who is a U.S. person or who is unable to make the declaration and who accepts the Offer will be deemed also to have accepted the Cash Alternative in respect of all the Plessey shares for which he accepts the Offer and must also sign the authority in Part C of the Form of Acceptance which irrevocably and unconditionally authorises Warburgs

or its agents to sell the new GEC shares and the GEC Convertible Stock to which he would otherwise be entitled under the Offer on his behalf and remit the proceeds of sale thereof (less expenses) to him or his agent outside the U.S.A. D.I. 35, Exhibit A, p. 25.

The Form of Acceptance again directs in bold print that no forms received either directly or indirectly from the United States would be accepted: "No Form of Acceptance which is received in an envelope postmarked in, or which otherwise appears to GEC or its agents to have been sent from, the U.S.A. will be treated as valid." *Ibid.*, Exhibit B, p. 2. To accept the Offer, *all* individuals must certify that they either are not U.S. persons or that they satisfy certain special conditions. *Ibid.*, Exhibit B, pp. 3–4. United States persons who accept the Offer are made specifically ineligible to receive a package of cash and GEC securities in exchange for their tendered Plessey shares. Rather, if otherwise eligible, they must accept a cash only option.[13] *Ibid.*, Exhibit A, p. 18.

The Form of Acceptance also includes a request that all individuals accepting the Offer provide a daytime telephone number outside the United States where the person can be contacted in the event of a query. *Ibid.*, Exhibit B, p. 3.

The GEC Offering Circular provides that the Offer is being made only to acquire the Ordinary shares of Plessey. *Ibid.*, Exhibit A, pp. 2, 9, 11. "The Offer does not extend to Dollar shares or to American Depositary Receipts evidencing American Units comprised of Dollar shares. The Offer does extend to Plessey shares arising on the conversion of Dollar shares, including those resulting from the exercise of conversion rights attaching to the Plessey Inc. Debentures." *Ibid.*, Exhibit A, p. 13.

Finally, under the terms of the Offer, "GEC reserves the right to treat as valid any acceptance of the Offer which is not

---

13. "I/We irrevocably and unconditionally authorise Warburgs ... to sell the new GEC shares and the GEC Convertible Stock to which I/we would otherwise be entitled under the Offer and

to remit the proceeds of the sale ... to [the named individual at the address] outside the U.S.A." *Ibid.*, Exhibit B, p. 4.

entirely in order . . . ." *Ibid.*, Exhibit A, p. 18.

GEC sent copies of the Offering Circular to Plessey to be forwarded to Plessey's shareholders whose addresses are not in the United States or its territories and possessions. Affidavit of Derek Alan Higgs, D.I. 34, p. 12; Deposition of Michael Lester, D.I. 27, p. 39. GEC also sent copies of the circular to its own shareholders whose approval of the acquisition is necessary. *Ibid.*, p. 38. GEC did not mail its United States stockholders copies of the Offering Circular for their review. *Ibid.*, p. 48. GEC states that it did not forward the Offering Circular to its United States shareholders because "[t]he documents themselves are marked not to be distributed into the United States of America." *Ibid.*, p. 48.

No press release was issued or press conference held in conjunction with the December 23, 1985 Offering Circular distribution. *Ibid.*, pp. 42–43. Still, the United States news media did report the issuance of GEC's formal Offering Circular. D.I. 22, Exhibit E, pp. 35–37 [one article in the Financial Times (United States Edition) on December 24, 1985 and two articles in the same tabloid on December 27, 1985]; *ibid.*, p. 39 ["GEC Moves on Hostile Buy of Plessey", Electronic News, December 30, 1985].

Daily closing prices for Plessey ADRs on the NYSE remained fairly constant through the period December 20, 1985 to January 7, 1986.[14] The closing price of Plessey ADRs on the NYSE on the day the GEC Offering Circular was distributed in London was a decline from the prior date's price. It declined even further the following day, December 24. Specifically, the closing prices for Plessey ADRs through that period were December 20 (25½), December 23 (25), December 24 (24½), December 26 (25), December 27 (26), December 30 (26¾), January 2, 1986 (26¼), January 3 (26½), January 6 (26) and January 7 (26⅝).

14. January 7, 1986 is the last date for which Plessey ADR NYSE prices were supplied to the

As stated earlier, Plessey ADRs, Dollar shares and Ordinary shares are separate, convertible classes of Plessey securities. Although GEC's December 9, 1985 press release and December 23, 1985 Offering Circular express the company's interest in acquiring Ordinary shares, not a single Dollar share was converted to an Ordinary share by a United States Plessey shareholder between December 3, 1985 and January 3, 1986 (the record on this point ends with January 3). D.I. 35, Exhibit H. In addition, one of Warburg's directors states that to his knowledge, no inquiries have been received from the United States requesting to participate in the December 23 Offering Circular. Affidavit of Derek Alan Higgs, D.I. 34, p. 12, ¶ 26.

## II. STANDARD FOR PRELIMINARY INJUNCTION

This matter is before the Court on Plessey's motion for preliminary relief. In order for a preliminary injunction to issue, the well established rule in this Circuit requires Plessey to demonstrate:

(1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted . . . . Moreover, while the burden rests upon the moving party to make these requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest" . . . . While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements. On the basis of the data before it, the district court must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing.

Court.

*Eli Lilly and Co. v. Premo Pharmaceutical Labs,* 630 F.2d 120, 136 (3d Cir.1980), quoting *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir.1978).

## A. LIKELIHOOD OF SUCCESS ON MERITS

To satisfy the burden imposed by this application, Plessey must show that at a trial on the merits it is likely to prove that GEC's December 9 press release triggered the disclosure requirements of the Williams Act. Specifically, Plessey must show that GEC (1) made a tender offer to American ADR holders that (2) used the "jurisdictional means" contemplated by section 14(d)(1). By "jurisdictional means" we refer to the threshold requirement of section 14(d)(1) that a tender offer be made "directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise." 15 U.S.C. § 78n(d)(1).[15] Plessey's task is complicated by the nebulousness of the "tender offer" and "jurisdictional means" concepts and their uncertain application to transactions originated offshore. In reviewing the merits of Plessey's proffer, therefore, this Court cannot ignore the policies which motivated passage of the Williams Act.

The statutory language relevant to disposition of this case is embodied in section 14(d)(1) which makes it:

unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 12 of this title ... unless at the time copies of the offer or request

or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 13(d) of this title, and such additional information as the Commission may by rules and regulations prescribed as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78n(d)(1). Although the term "tender offer" has never been expressly defined by Congress, the legislative history suggests a congressional intent to retain flexibility so that the courts and the SEC can effectuate the goals of the Williams Act. *See* Hazen, *The Law of Securities Regulation* 348–49 (1985). Both the courts and the SEC have developed factors relevant to a determination of whether a tender offer exists but no single set of factors is exclusively accepted. While instrumentalities of interstate commerce other than the mails have been held to constitute the jurisdictional means for the triggering of the Williams Act, *see, e.g., Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir.1972), the boundaries of the concept have never been enumerated. It appears, therefore, that a court determining the applicability of the Williams Act to a particular transaction must weigh the facts unique to the case before it, informed by both the relevant precedents and the congressional purpose.

The Supreme Court summarized the congressional intent expressed by passage of the Williams Act in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975):

The purpose of the Williams Act is to insure that public shareholders who are *confronted by a cash tender offer for their stock* will not be required to re-

---

**15.** The importance of showing that the jurisdictional means of the Williams Act have been used by a bidder is made evident in the SEC's proposed Regulation § 240.14d–10(a)(1)(ii):

(a) No bidder shall make a tender offer unless:

(1) The tender offer is open to all security holders of the class of securities subject to the

tender offer; *however,* this section shall not affect: (i) dissemination under Rule 14d–4 or (ii) tender offers in which the bidder is not a United States resident or citizen and the tender offer does not employ any jurisdictional means enumerated in Section 14(d)(1) of the Act.

spond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The *Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids* or prevent large accumulations of stock which would create the potential for such attempts.

*Id.* at 58, 95 S.Ct. at 2076 (emphasis added). Two important policies emerge from the Court's opinion. First, the Williams Act seeks to protect only those shareholders who face the tender decision. Second, the requirements of the Williams Act are not to be interpreted to provide incumbent management with advantages against their hostile suitors.

1. *Does the December 9 Press Release Constitute an Offer to the American ADR Holders?*

■ Plessey argues that the December 9 press release is an offer to the American holders of ADRs and 4½% Convertible Subordinated Debentures because it states that GEC will honor Ordinary shares arising through the conversion of these instruments. Plessey is unpersuaded by GEC's provisos warning against the introduction of the offer into America, claiming essentially that the boldface admonishments on the released documents constitute a ruse to conceal GEC's true desire to acquire ownership of the 1.6% of Plessey's equity securities in the United States. In its defense, GEC points to the express language of the Williams Act limiting the scope of section 14(d)(1) to a tender offer for *"any class of any equity security"*, 15 U.S.C. § 78n(d)(1) (emphasis added), as evidence that its offer can be restricted to Ordinary shareholders without implicating the rights accruing to holders of other Plessey equity securities. Each side has cited a case "dispositive" of the issue but neither precedent truly ad-

dresses the question before us. We must, therefore, look to several sources of authority to assess the contentions of the parties.

Since Plessey has not contended that this Court should refuse to give meaning to the "any class" language of section 14(d)(1), our task is not to determine whether GEC has made an offer for an "equity security" but rather whether GEC has made an offer for a *class* of equity securities which subsumes ADRs and convertible debentures. We begin by examining Plessey's most recent Form 20–F which was filed with the SEC for the fiscal year ending March 29, 1985. Dubin Affidavit, D.I. 22, Exhibit A. Under the heading "Title of Each Class" (of Registered Securities), Plessey listed the following:

> "Dollar Ordinary Shares, par value 25 pence per share
>
> Ordinary Shares, par value 25 pence per share*
>
> American Depositary Receipts evidencing the above

---

*Only those which may be issued upon a *change of class* of Dollar Ordinary Shares pursuant to the terms of such securities." (Emphasis added.)

By Plessey's own admission, the Dollar shares available to ADR and debenture holders are a different *class* of security. When the holders of Dollar shares exchange them for Ordinary shares, they are deemed *by Plessey* to have *changed security classes*.

This class distinction is further illuminated by the events of December 11. Section 2.6 of the British City Code requires an offeree to mail copies of the offer to its record shareholders; in addition, General Principle No. 2 of the City Code prohibits an offeree company from "furnish[ing] information to some shareholders which is not available to all shareholders." Plessey complied with these rules by mailing the Warburg release only to Citibank, the record shareholder of the Dollar shares. Citibank's mailing to ADR holders was a contractual exercise not compelled by the City Code. Thus, it appears that Plessey

understood British law to differentiate Ordinary shareholders from ADR holders because it did not itself treat the ADR holders as record shareholders entitled to know of the GEC offer.

GEC has argued that the distinctions made in its offer between convertible securities and Ordinary shares are not unique to this tender offer. GEC has cited a number of tender offers extant in the United States in which the bidder has made a tender offer for the principal class of common stock but not for the class of securities convertible into it. While this apparent evidence of a general practice is certainly relevant to the issue, it can hardly be considered compelling in the absence of judicial approval.

The precedents to which we have been cited as authority for each side's position, *Securities & Exch. Comm'n v. Texas Intern. Co.*, 498 F.Supp. 1231 (N.D.Ill., E.D. 1980) (by Plessey), and *Sargent v. Genesco, Inc.*, 492 F.2d 750 (5th Cir.1974) (by GEC), are also not dispositive. Plessey cites *Texas Intern. Co.* for the proposition that an offer is "deemed to include securities where they are encompassed by and are part of the object of the tender offer." Plessey Brief, D.I. 19, p. 28. But *Texas Intern. Co.* involved the purchase of creditors' claims which were to be *mandatorily* exchanged for a registered equity security following approval of a reorganization plan. Because of the unique circumstances, that court found the interest at stake to be an equity security. Here, however, both the unique circumstances and the mandatory conversion features are missing. Plessey's ADR and debenture holders clearly have the right not to convert. (At argument, Plessey alluded to GEC's plans to eliminate the rest of the Plessey shares as a "mandatory aspect" of this case. Transcript, D.I. 39, p. 35. However, GEC has not finalized any such plans. Moreover, the issue of whether such conduct by GEC would be appropriate is not before us.) The circumstances of the case also do not compel the conclusion that the offer for Ordinary shares was effectively an offer for ADRs and debentures. We therefore cannot rely on *Texas Intern. Co.* to resolve this issue.

*Sargent v. Genesco, Inc.*, 492 F.2d 750, is also distinguishable from the problem presented here because the plaintiffs, common shareholders of defendant corporation, had no right to convert their common shares into the convertible debentures for which the offer was made. There was also no evidence that the debenture holders had received inadequate information about the offer made to them. Hence, we cannot adopt *Genesco* for the broad principle that holders of convertible securities are never implicated in an offer for the shares into which they can be converted.

The remaining arguments made by counsel are essentially variations on the themes already discussed, namely, GEC's contention that the ADRs and debentures are often treated differently from Plessey Ordinary shares and Plessey's claim that GEC's Offer should be deemed as made to holders of the convertible instruments because it purports to honor Ordinary shares that may subsequently arise after conversion. Standing alone, no authority is dispositive of the issue before us. At a minimum, Plessey's own treatment of its ADR and debenture holders casts doubt upon its position here. Thus we cannot say on the record before us that Plessey has proved that it would probably succeed on this issue at a trial.

Although this could prove dispositive of Plaintiff's motion for preliminary injunctive relief, the Court is impelled by the circumstances of this case to address alternate issues.

2. *Did GEC Make an Offer Within the Jurisdictional Means of the Williams Act?*

Whether or not the December 9 press release represents an offer intended for American ADR holders, it is doubtful that GEC transmitted the offer by the means necessary to trigger provisions of the Williams Act.

Plessey contends that the jurisdictional means are satisfied by two events, namely, (1) Citibank's December 11 mailing to the American ADR holders, and (2) the reports of GEC's December 9 press release disseminated by the American media. Both arguments, however, appear to push the Williams Act beyond the boundaries of its intended purpose. Moreover, application of the statute to such conduct would raise serious concerns of comity with British law and practice. Such a ruling could also unfairly tilt the balance of our regulations and statutes in favor of takeover targets in cases that only remotely implicate American interests. Fortunately, the precedents do not compel us to reach those results.

(a) *Did Plessey's December 11 Mailing Employ the Jurisdictional Means of the Williams Act?*

The notion that a bidder should not be held responsible for information distributed by its target is most clearly enunciated in *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937 (2d Cir.1969). In that case, rumors of an imminent takeover were printed in the Wall Street Journal's "Heard on the Street" column. The story identified both the bidder and the target and stated the expected offering price at between $45 and $50 per share. While the bidder had, in fact, contemplated an offer, the price estimates reported by the column exceeded the offeror's valuation of the target. The market reacted to the Journal's story by driving the target's stock to an all-time high of 42⅞, an event so clearly contrary to the bidder's interest that the plaintiffs did not accuse the bidder of originating the rumors. Plaintiffs did contend, however, that the bidder had a duty to correct the Journal's error. Judge Friendly rejected the claim:

> While a company may choose to correct a misstatement in the press not attributable to it ... we find nothing in the securities legislation requiring it to do so. This is particularly true when the mis-

statement relates to its plans in regard to another company and it has reason to think the comment was an *effort by the target corporation* to obtain disclosure before the time Congress had stipulated. *Id.* at 949 (emphasis added).

■ While the facts of this case differ from our own, the essence of Judge Friendly's argument—that a bidder's disclosure obligations cannot be triggered by the calculated efforts of the target—cuts to the heart of the issue before us. It would be entirely contrary to the neutrality policy of the Williams Act to invoke its requirements simply because the target engaged in jurisdiction triggering conduct that the bidder had carefully avoided.

■ The Sixth Circuit reflected this thinking in an entirely different context when it refused to allow the purported victims of an intrastate fraud to manufacture jurisdiction under section 10(b) by mailing an allegedly fraudulent promissory note among themselves for signature. *Allied Development Corp. v. The First National Bank & Trust Co. of Steubenville*, 496 F.2d 1180 (6th Cir.1974). The court refused to assert federal "jurisdiction over a matter which was otherwise purely an intrastate dispute, to be governed by state law" simply because of the complainant's acts. *Id.* at 1181. In our case, all significant events, save the December 11 mailing, occurred in England.[16] The December 11 mailing itself was an act involving only Plessey and its shareholders. The *Allied Development* holding suggests that in a case where the complainants initiated the only use of interstate commerce channels, it is proper to respect the integrity of the sovereign with the overwhelming interest and deny application of the federal securities laws.

The result suggested by both *Electronic Specialty Co.* and *Allied Development Corp.* is firmly supported by the policies of the Williams Act. A ruling in favor of

---

**16.** For the moment, we leave to the side the American news accounts of the December 9 press release. They will be addressed below.

Plessey on this issue would allow a foreign corporation targeted by a hostile foreign bidder to impose upon its suitor the obligations and requirements of American law, thereby gaining additional time with which to undertake other defensive tactics, simply by mailing details of the offer to an interested American or by "arranging" a press release in the United States. The Williams Act can hardly be read to authorize such indiscriminate intervention and the attendant burden upon American courts and regulatory agencies when it steadfastly refuses to upset the even-handed balance of its regulations in quintessentially American transactions. *Cf. Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir.1985), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975) ("When ... a court is confronted with transactions that· on any view are predominantly foreign, it must seek to determine whether congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries.") (Friendly, J.) Moreover, such a reading would render the jurisdictional means language of section 14(d)(1), largely a provision imposing limitations on the application of the Williams Act, pointless. Consequently, we must conclude that the December 11 mailing does not implicate the jurisdictional means of the Williams Act.

(b) *Did the American Press Accounts of the December 9 Press Release Employ the Jurisdictional Means of the Williams Act?*

■ Although Plessey's argument that the domestic news reports of GEC's activities triggered the requirements of the Williams Act presents a closer and more complex issue, the relevant precedents and policies also appear contrary to its position. Plessey relies heavily on *In the Matter of Carl M. Loeb, Rhoades & Co.*, 38 S.E.C. 843 (1959) and *Chris-Craft Industries, Inc. v. Bangor Punta Corp.*, 426 F.2d 569 (2d Cir.1970), for the proposition that "[p]ress releases have often been the cause of Section 5 violations." Plessey Brief, D.I. 19,

at 31. Plessey also emphasizes these cases when it identifies its real concern with GEC's conduct, namely, "the plain intention ·of the December 9 Press Releases ... to arouse interest on the part of ADR holders in converting and tendering their shares into the Exchange Offer." Plessey Brief, D.I. 19, p. 35. However, *Carl M. Loeb, Rhoades & Co.*, 38 S.E.C. 843, is actually contrary to the position advocated by Plessey while *Chris-Craft Industries, Inc. v. Bangor Punta Corp.*, 426 F.2d 569, is distinguishable in its essential details. In addition, Plessey has ignored the precedents which limit an offeror's liability for what is printed in the press about his activities. Lastly, the precedents which give transnational effect to the Exchange Act do not appear to contemplate a case such as this one where the absence of both a harmful domestic impact and elements of fraud heighten our concern with principles of comity.

Plessey fairly and accurately cites language from *Carl M. Loeb, Rhoades & Co.*, 38 S.E.C. 843, where the SEC found a violation of section 5 because a *"press release and resultant publicity"* about a forthcoming 25 to 30 million dollar stock offering "was of the character *calculated*, by arousing and stimulating investor and dealer interest ... to set in motion the process of distribution." *Id.*, 38 S.E.C. at 851–53 (emphasis added). In its brief, Plessey emphasizes many words from *Carl M. Loeb, Rhoades & Co.* but it does not highlight the word "calculated." The defendants in that case deliberately timed their press release to gain exposure in three prominent New York newspapers. They also distributed the release to the domestic wire services. Their efforts were rewarded by expressions of interest from 101 securities firms and 58 members of the public in the two days following the announcement. In contrast, GEC excluded all members of the American media from their December 9 press conference. The impact of their efforts can be seen in the relative dearth of inquiries received from Americans following the press accounts of the offer. The

light of good faith which these factual distinctions cast upon GEC's conduct is especially important when this language is considered: ·

> Difficult and close questions of fact may arise as to whether a particular item of publicity by an issuer is part of a selling effort or whether it is an item of *legitimate disclosure* to investors unrelated to such an offer. n. 20 / Whether in any particular case publicity is an offer *depends upon all the facts, and the surrounding circumstances* including the nature, source, distribution, timing, and apparent purpose and effect of the published material.

*Id.* at 853 (emphasis added). Given Plessey's concession that the December 9 press release is a step required by British takeover practice, the legitimacy of the act cannot be denied. Plessey may, however, contend that the press release nonetheless amounts to an effort to sell to Americans, but our discussion *supra* at page 24 shows that at best GEC's motives toward ADR holders is an open question. When all the other factors are weighed—the exclusion of the American media, the prohibitions against distribution of the release in America, the abbreviated and distorted reporting in the United States, the minimal percentage and relative unimportance of the shares held in America, and the minimal effect on the American market—the inquiry suggested by *Carl M. Loeb, Rhoades & Co.* contradicts the result sought by Plessey.

The Second Circuit's *en banc* decision in *Chris-Craft Industries, Inc. v. Bangor Punta Corp.*, 426 F.2d 569, also fails to address the real issue before us. In that case, Bangor Punta issued a press release stating that it had "agreed to file a registration statement" for an offer of securities having a value of $80 or more, which shares it planned to exchange for the common stock of its target, Piper Aircraft. *Id.* at 571–72. The court issued the preliminary injunction sought by a competing suitor, Chris-Craft Industries, because the press release exceeded the bounds of pre-filing disclosure permitted by Rule 135. The court found it:

> reasonable to conclude that the assigning of a value to offered shares constitutes an offer to sell. One of the evils of a premature offer is its tendency to encourage the formation by the offeree of an opinion of the value of the securities before a registration statement and prospectus are filed. There is then no information on file at the SEC by which the Commission can check the accuracy of the information which forms the basis of the offeror's estimate of value, and any offeree, such as the reader of a press release, is encouraged to form a premature opinion of the value without benefit of the full set of facts contained in a prospectus.

*Id.* at 574–75. GEC does not contest the result reached in *Chris-Craft.* It concedes that its press release would have constituted an offer for Plessey Ordinary shares within the meaning of the Williams Act if the events of December 9 had occurred in the United States. The key distinction between our case and *Chris-Craft*, however, is the fact that GEC did not issue its release in the United States. Rather, its contents were summarized and disseminated by American journalists who did not receive the release directly. The penultimate question is whether what was done falls within the intended jurisdiction of section 14. To resolve that question, we must turn to those cases which discuss either an offeror's responsibility for press accounts or the extraterritorial effect of the American securities laws.

Following in the spirit of *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, the Second Circuit has found that a bidder is not responsible for reports on the Dow Jones tape that it has "effectively increased" its offering price when it has not, in fact, done so. *Osofsky v. J. Ray McDermott & Co., Inc.*, 725 F.2d 1057, 1059 (2d Cir.1984). In *Osofsky*, the bidder's offering materials stated the tender offer price to be $62.50, a sum which included a $2.50 special dividend owed by the target. Confusion arose be-

cause the bidder had reserved the right to reduce the offer to reflect the special dividend. When the bidder publicly announced his decision not to exercise this option, *i.e.*, to "pass on" the $2.50, it effectively agreed to offer a total value of $62.50. The Dow Jones tape mistakenly reported the special dividend decision as an effective increase in the offer to $65.00. While the court noted that the public announcement could conceivably have been viewed as an increase in the offer because it came in response to a move by a rival, the record before it did not reveal that to be the logical interpretation. The factors considered by the court in reaching its decision are illuminating:

> all of the [bidder's] material stated the tender offer price to be $62.50 ... there apparently was no testimony that any tendering shareholder in fact believed the price to be $65.00. Under *Electronic Specialty Co.* ... the [bidder] was *not obligated* to correct the statement on the Dow Jones tape that [it] "effectively increased" the offer price to $65.00, since the statement *wasn't attributable* to [it].

*Id.* at 1059 (emphasis added). Here, all of the December 9 material that Citibank mailed to ADR holders states that the offer was not open in the United States. More importantly, there is no evidence that any ADR holder thought that an offer had been made to him. After December 9, no ADRs were converted to Dollar shares. In addition, the trading volume of the ADRs was within the historic norms. Finally, the reports printed in the United States are not fairly attributable to GEC because they omit GEC's clear proviso that the offer is not open in America. Consequently, although both GEC and the *Osofsky* bidder spoke to the press, the mistaken contents of the reports (here the possibility that the offer would be open to Americans) cannot be fairly attributed to them.

The protection accorded by *Electronic Specialty* and *Osofsky* can be vitiated by evidence that the defendant "sufficiently entangled itself" with the disseminated reports. *See, Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156 (2d Cir.1980). Here, all factors presently in the record evidence a considerable distance between GEC and the American press reports. The December 9 press conference was a British only affair where the materials distributed visibly warned recipients that the offer would not be made in the channels of American commerce. Thus, the protections that we have analogized from the *Electronics Specialty* line of case appears to remain available to the "non-entangled" GEC conduct.

Further support for the proposition that the American press reports should not be deemed to have triggered the jurisdictional means of section 14(a)(1) can be gleaned from *Indiana Nat. Bank v. Mobil Oil Corp.,* 578 F.2d 180 (7th Cir.1978), where the legal significance of a "public announcement" was weighed by its "generally accepted meaning in [the] field." *Id.* at 185. In that case, Mobil allowed sophisticated investors to accept its tender by mailing the necessary documents to its depositary "eight business days after [a] public announcement by Mobil that a specified number of Shares will be purchased under this Offer." *Id.* at 182. A controversy arose about whether Mobil had made such a "public announcement" by a "press release to the Dow Jones Wire Service, Reuters Economic Services, Platts Oilgram, the Oil and Gas Journal, Petroleum Intelligence Weekly, and a press service which distributed it to the wire services, radio and television networks and major newspapers." *Id.* at 183. The court concluded that Mobil had made a "public announcement" because the term "has a generally accepted meaning in the field and involves the issuance ... of a press release. Put another way, the courts have equated a press release with a public announcement in the context of tender offers or related securities transactions." *Id.* at 185 (citations omitted). This approach to the issue raises a question in our case, namely, how do both sophisticated and unsophisticated investors perceive American news accounts of a foreign press release not available in this country. The events following December 9 strongly suggest that, at least in this case, investors did not "generally accept"

the news accounts as tender offers. Both the sophisticated and unsophisticated remained on the sidelines. Beginning on December 9, both the trading volume and price of ADRs were stable, particularly when compared to the December 3–9 period. In addition, no ADR conversions occurred. While by no means dispositive, the analysis suggested by *Indiana Nat. Bank* adds another factor in our perception that the reports published by the Wall Street Journal and The New York Times do not constitute the use of an instrumentality of interstate commerce within the meaning of the Williams Act.

### (c) *The Extraterritorial Effect of the Securities Laws—Notions of Comity and Policy*

■ Plessey has argued that news accounts of the December 9 press release should be considered to have triggered the jurisdictional means of the Williams Act because the Act has been construed to have an extraterritorial effect that embraces the conduct before us. Although the Second Circuit has developed a substantial jurisprudence on the extraterritorial effect of the Exchange Act, *see e.g., Schoenbaum v. Firstbrook*, 405 F.2d 200, *rev'd in part,* 405 F.2d 215 (2d Cir.1968) *(en banc ), cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969); *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326; *Bersch v. Drexel Firestone, Incorporated,* 519 F.2d 974 (2d Cir.1975), *cert. denied,* 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *IIT, an Intern. Inv. Trust v. Vencap, Ltd.,* 519 F.2d 1001 (2d Cir.1975); *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980), its cases have focused largely on adjudicating acts of fraud, a harm not claimed here. As Judge Friendly has said, "[t]he problem of conflict between our laws and that of a foreign government is much less when the issue is the enforcement of the anti-fraud sections of the securities laws than with such provisions as those requiring registration of persons or securities." *ITT v. Cornfeld,* 619 F.2d at 921. Thus, while the extraterritorial reach of the Exchange Act is undeniable, we find that

the language of section 14(d)(1) is too inconclusive to lead us to believe that Congress intended to impose rules governing conduct throughout the world in every instance where an American might have an interest. *See Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d at 1334 (making such comment about section 10(b), which contains language similar to section 14(d)(1) ). Hence, in addition to the relevant precedents, considerations of comity and policy should play a role in our interpretation of the jurisdictional means of the Williams Act. *See SEC.v. Kasser,* 548 F.2d 109, 116 (3d Cir.1977).

The results reached by the Second Circuit in the cases cited above do not control the outcome here because they achieve solutions to problems with which we are not confronted. To prevent the United States from becoming a "Barbary Coast" hospitable to international securities "pirates" who defraud investors, the exercise of jurisdiction by American courts must be broad. *SEC v. Kasser,* 548 F.2d at 116. But "[i]t is elementary that the anti-fraud provisions of the federal securities laws apply to many transactions which are *neither within the registration requirements* nor on organized American markets." *Bersch v. Drexel Firestone, Inc.,* 519 F.2d at 986 (emphasis added). It is also evident from the precedents that, in the absence of a strong American interest, there is "no reason to extend jurisdiction to cases where the United States activities ... are relatively small in comparison to those abroad." *IIT v. Cornfeld,* 619 F.2d at 920, *citing Bersch v. Drexel Firestone, Inc.,* 519 F.2d at 987. Here, the American interest asserted by Plessey is the dissemination of information to domestic investors who are faced with a hold or sell decision. First, it is at best an open question whether the American ADR holders face such pressure in this case. In addition, the very existence of the jurisdictional means language of section 14(d)(1) suggests that tender offers will not implicate an American interest if they are conducted outside the instrumentalities of interstate com-

merce. Thus, where a foreign bidder has steadfastly avoided American channels in its pursuit of a foreign target, the American interest in extensive disclosure appears minimal. Where the only acts within the United States are second hand news accounts not directly attributable to the bidder, the American contact which would justify an exercise of jurisdiction is relatively small and counsels against its use.

The distinction between our case and those decided by the Second Circuit can be seen by a brief examination of the seminal case, *Schoenbaum v. Firstbrook*, 405 F.2d 200. In that case, "an issue of stock to insiders of a Canadian company in Canada, allegedly at an unfairly low price, adversely affected the value and the price of its shares listed on the American Stock Exchange, some of which were held by resident American citizens, including the plaintiff." *Bersch v. Drexel Firestone, Inc.*, 519 F.2d at 985–86. The court exercised its jurisdiction because it believed "that Congress intended the Exchange Act to have extraterritorial application in order to protect domestic investors who have purchased foreign securities on American exchanges and to protect the domestic securities market from the effects of improper foreign transactions in American securities." *Schoenbaum v. Firstbrook*, 405 F.2d at 206. While we must bear in mind that "the presence or absence of any single factor considered significant in other cases dealing with the question of federal jurisdiction in transnational securities cases is not necessarily dispositive [of] future cases," the absence of certain key facts in our case points away from an exercise of American jurisdiction. *IIT v. Cornfeld*, 619 F.2d at 918. First, the transaction in question can hardly be labeled an "improper foreign transaction." Everything that GEC did up to and including the events of December 9 conformed with British law and practice without violating such substantive American rules as those against fraud and self-dealing. Consider also that GEC had concluded that its offer should

avoid the American market and its attendant regulations. With that in mind, it called in the British press and told them, among other things, that the offer would not be made to the American market. Admittedly, such a newsworthy event would have international implications that GEC could have foreseen. But what more could GEC have done? Certainly it could not muzzle its own press to prevent international transmission. Nor could it prohibit the subsequent indirect transmission to the United States which emerged in an abbreviated and dangerously distorted fashion. Should we impose on GEC the obligation to monitor the world press? Could it correct every error regardless of who made it or where it was published? Consider also that there has been a beneficial, rather than an adverse, effect on the American ADR market and no evidence exists that GEC "intended to produce ... detrimental effects within" the United States. *See Schoenbaum v. Firstbrook*, 405 F.2d at 206. Thus, we are confronted with the takeover of one British company by another in which 98.4% of the relevant shares are held outside America and the only possible American consequence is aroused investor interest due to American newspaper accounts beyond the control of the offeror. In such a situation the exercise of federal court jurisdiction appears ill advised.

In a securities case with extraterritorial consequences, *SEC v. Kasser*, 548 F.2d 109, the Third Circuit explored the exercise of federal jurisdiction from "a policy perspective" because it recognized that in "large measure" such cases "[call] for a policy decision." *Id.* at 116. Judge Friendly, the architect of most of the extraterritorial jurisprudence in securities law, has already recognized the propriety of considering concepts of foreign relations law as part of the jurisdiction inquiry. *See Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d at 1335. It appears appropriate, therefore, for us to consider the notions of comity embodied in section 403 of the proposed final draft of the Restatement of

Foreign Relations Law.[17] Section 403 suggests that a court consider eight factors when it weighs the reasonableness of asserting its jurisdiction. Briefly, we note that the activities at issue here have taken place outside the United States, and have had a negligible impact inside the United States, *cf.* 403(2)(a); that the persons to be regulated are British subjects, *cf.* 403(2)(b); that the British have their own sophisticated regulatory structure for takeovers which does not impose the requirements sought by Plessey and that these requirements do not appear necessary to protect American interests in this case, *cf.* 403(2)(c); that the imposition of American law would frustrate the justifiable expectations of GEC that they would not have to comply with American law, *cf.* 403(d); and that American interference with a transaction of such enormous magnitude to the British economy would contravene traditional international notions of non-interference in a matter of strong British interest, *cf.* 403(f)(g). Moreover, the policy objective of fostering comity, *see SEC v. Kasser*, 548 F.2d at 116, would be frustrated by an exercise of jurisdiction here in light of the attendant circumstances. In *Kasser*, the Third Circuit believed that the punishment of extraterritorial fraud would encourage other countries to take "action against fraudulent schemes aimed at the United States from foreign sources." *Id.* Here, the requirement that British companies comply with the disclosure burdens of United States law in a merger with minimal American contacts might encourage other countries to impose similar requirements on American companies whose operations tangentially affect foreign lands. Such a result would upset the delicate balance struck by the Williams Act by creating an additional obstacle to domestic corporate acquisitions. Thus, an imposition of jurisdiction here would not only affront legitimate and powerful British interests but might well adversely affect the American policy interests of the Williams Act.

We caution that the preceding discussion is not intended to suggest that news reports of foreign transactions in the American media can never be a sufficient use of the jurisdictional means of the Williams Act. It is intended only as a commentary on the facts we have before us today. On the one hand, we have a British bidder who seeks the Ordinary shares of a British target through an offer carefully structured to avoid the channels of American commerce; we have, in addition, the fact that 98.4% of the target's potential voting shares are in hands not belonging to Americans, *i.e.*, the American shares will have almost no impact on the outcome of the contest even if they are tendered; and we have evidence that GEC has complied with all aspects of British takeover practice. In addition, we have no logical evidence of a motive by GEC to implicate United States

17. In relevant part, section 403(2) provides:

403. Limitations on Jurisdiction to Prescribe

\* \* \* \* \* \*

(2) Whether the exercise of jurisdiction is reasonable or unreasonable is judged by evaluating all the relevant factors, including, where appropriate,

(a) the extent to which the activity (i) takes place within the regulating state, or (ii) has substantial, direct, and foreseeable effect upon or in the regulating state;

(b) the connections, such as nationality, residence, or economic activity, between the regulating state and the persons principally responsible for the activity to be regulated, or between that state and those whom the law or regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states

regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation in question;

(e) the importance of the regulation in question to the international political, legal or economic system;

(f) the extent to which such regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by other states.

Restatement of the Foreign Relations Law of the United States (Revised) Tentative Final Draft (1985).

interests. To suggest that it excluded the American media from its December 9 press conference in the hope of provoking interest in America appears highly improbable. GEC would have little to gain from it in their fight for Plessey but much to lose in becoming entangled in American law and regulations. On the other hand, we have Plessey, a British target who invokes the protections of the Williams Act not, it says, to stop the tender offer but rather to compel disclosure to its ADR holders of the terms of an offer it has already characterized as inadequate and ill-advised. It is at least possible that Plessey's efforts in this litigation are motivated by a desire more to delay than to inform, more to gain an advantage than to preserve neutrality. This Court, therefore, concludes that it would be a perversion of the principles of the Williams Act to delay the processes of a quintessentially British takeover when American investors and interests are but barely touched. This argument assumes both the use of jurisdictional means and the availability of the tender offer to the class of stock represented by the ADRs. These are assumptions that, at least on the present record, have little or no probability of being successfully established.

## B. IRREPARABLE HARM

Plessey's argument on the issue of irreparable harm is twofold. First it argues that GEC's mere failure to comply with sections 14(d) and 14(e) of the Exchange Act is a sufficient showing as a matter of law to satisfy the requirement of irreparable harm. Alternatively, Plessey contends that GEC's continued failure to fully disclose the terms of its tender offer to Plessey's United States ADR holders will irreparably harm Plessey's financial and corporate image and the investment positions of Plessey's American shareholders.

An examination of the cases cited by Plessey in support of its first argument is not persuasive. Plessey cites *Studebaker Corp. v. Gittlin,* 360 F.2d 692 (2d Cir.1966) in support of its contention that defendant's mere violation of the securities laws

triggers plaintiff's extraordinary relief. But *Gittlin* does not state that "irreparable injury" need not be demonstrated. As a matter of fact, the following quotation corroborates the conclusion that, standing alone, the mere violation of a statute is not enough to satisfy the requirement of irreparable harm. Indeed, the quotation recognizes the traditionally accepted standard: "A plaintiff asking an injunction because of the defendant's violation of a statute is not required to show that otherwise rigor mortis will set in forthwith; all that 'irreparable injury' means in this context is that unless an injunction is granted, the plaintiff will suffer harm *which cannot be repaired."* *Id.* at 698 (emphasis added).

Similarly, Plessey cites *Pabst Brewing Co. v. Kalmanovitz,* 551 F.Supp. 882 (D.Del.1982), for the proposition that a showing of an alleged section 14(d) or section 14(e) violation is enough for equitable relief. Again, a review of that court's conclusion shows otherwise. The "traditional standard" was applied: "[I]f the tender offer is consummated, it will be virtually impossible for this Court to undo the transaction which would leave the plaintiff and its shareholders *without an adequate remedy at law."* *Id.* at 895 (emphasis added).

### 1. The Necessity to Demonstrate Specific Irreparable Harm

In the context of a securities law violation, the Supreme Court in *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 rejected a motion similar to that made by Plessey in this case. Defendant Rondeau had acquired more than 5% of Mosinee Paper's stock without first filing the appropriate disclosures pursuant to section 13(d) of the Exchange Act. Rondeau did not know of the section 13(d) requirement but corrected his error once he became aware of the statute. He did so, however, three months after the statutory time period had lapsed. Mosinee Paper sued for an injunction to stop Rondeau from voting his stock or acquiring new shares. The Supreme Court reversed the Court of Appeals decision which had grant-

ed the injunction based solely on Rondeau's violation of section 13(d): "We disagree with the Court of Appeals' conclusion that the traditional standards for extraordinary equitable relief do not apply in these circumstances ...." *Id.* at 57, 95 S.Ct. at 2075. "The basis of the remedy in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Id.* at 57, 95 S.Ct. at 2075, *citing Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 506–07, 79 S.Ct. 948, 954–55, 3 L.Ed.2d 988 (1959); *see, National Farmers Union Insurance Companies v. Crow Tribe of Indians,* — U.S. —, 105 S.Ct. 2447, 2454 n. 22, 85 L.Ed.2d 818 (1985).

Similarly, the Third Circuit applies the "traditional standard" in determining whether equitable relief *pendente lite* is warranted: "This Court has held that more than a risk of irreparable harm must be demonstrated. The requisite for injunctive relief has been characterized as a 'clear showing of immediate irreparable injury' [citation omitted] or a presently existing actual threat ...." *Continental Group, Inc. v. Amoco Chem. Corp.,* 614 F.2d 351, 359 (3d Cir.1980).

■ To reject Plessey's argument on this point is not to suggest that a violation of a statute standing alone may never satisfy the requirement of irreparable harm. As a matter of law it may, but the particular facts of each situation must be weighed in light of the traditionally accepted standard before granting the extraordinary writ.

■ Thus, Plessey must fail in its argument that a showing of GEC's alleged statutory violations alone calls for the extraordinary remedy of a preliminary injunction. Rather, Plessey must fulfill its burden to show that GEC's *continuing* violation of

section 14(d) and/or section 14(e) will result in specific irreparable harm *pendente lite.*

### 2. *Plessey Has Failed to Demonstrate Specific Irreparable Harm*

In the search of the record to support such a standard, it is important to note at the outset that Plessey does not seek this injunction to stop the GEC Offer of December 23, 1985 (as contained in the Offering Circular) but seeks only an injunction to require additional disclosure under sections 14(d) and 14(e) of the Exchange Act.[18]

■ In its complaint, Plessey alleges irreparable harm to itself because it [Plessey] continues to be deprived of material information "which is essential to the making of an informed investment decision." D.I. 1, p. 11. This contention lacks merit. Plessey has received GEC's December 23, 1985 Offering Circular and all of the registration and disclosure information required by United Kingdom law. Plessey, as an entity separate from its ADR holders, can hardly maintain that it lacks pertinent information concerning the present Offer. The fact is, having received the Offering Circular, Plessey has received all of the information that is required under the laws and practices of Great Britain and, from the present record, it appears safe to conclude that section 14(d) or 14(e) filings would not add anything materially new.

■ Still, Plessey urges the Court that it is being irreparably harmed by the public perception that under the present circumstances it has not or cannot protect its shareholders. Plessey is concerned that if its ADR holders become injured due to the lack of information and misinformation contained in the December 9 Warburg press release that "it would be very diffi-

---

**18.** As discussed earlier in this Opinion, Plessey alleges in its verified complaint and in its brief that GEC also violated section 5 of the 1933 Act by offering unregistered GEC securities to United States Plessey ADR holders as part of its December 9, 1985 "offer." Although Plessey requests the Court to find that the GEC December 9 press release violates section 5, Plessey asks for no relief in that regard. Plessey Opening Brief, D.I. 19, p. 63. Plessey seeks section 5

disclosure only within the scope of its section 14(d) and section 14(e) claims. D.I. 1, p. 11; Deposition of Warren J. Sinsheimer, D.I. 26, pp. 105–108. And Plessey specifically maintains that it does not seek United States registration of any securities by GEC. Hearing Transcript, D.I. 39, pp. 5–6. Therefore, the Court does not address separately the section 5 registration issues but incorporates these within its discussion of sections 14(d) and 14(e).

cult [for Plessey] to gain access to the capital markets in the United States if we had that reputation." *Ibid.*, pp. 45–46.

This argument again misconstrues the prerequisites for the Court's grant of equitable relief. First, Plessey asserts no *immediate* personal harm to support an injunction. More importantly, there are a variety of remedies available to Plessey to protect itself from this particular harm should Plessey succeed on the merits after a full trial. With nothing on the record at this time to support a finding that Plessey even intends to gain new access to United States markets, there is no basis for concluding that there is any harm to Plessey in this regard, let alone irreparable harm. Plessey's plight is wholly speculative.

▮ Plessey has also failed to demonstrate irreparable injury to its United States ADR holders on whose behalf it brings this suit.[19] In this matter, the ADR holders' injuries are compensable in damages and the absence of other immediate, threatening and irreversible harm precludes the granting of extraordinary relief.

This case is not a traditional tender offer conflict where the target company has moved for a preliminary injunction in an effort to block an impending change in corporate control. Plessey has repeatedly stated that it does not seek an injunction to stop GEC's acquisition under its December 23 Offering Circular. Rather, Plessey seeks only what it views as needed disclosures under sections 14(d) and 14(e) of the Exchange Act to enable its ADR holders to participate in the Offer and make informed investment decisions. Plessey complains that its ADR holders remain "confused" as to their ability to participate in the Offer because the last communication they received was the "misleading" December 9 Warburg press release.

Although the Court appreciates the fact that the Plessey ADR holders may be confused, that is not the issue here. The issues are whether they have a right to participate in the current Offer and whether additional disclosure would correct that confusion and eliminate threatened irreparable harm. The Court must answer both issues in the negative.

First, there is little evidence in the record to support the conclusion that the United States Plessey ADR holders have a right to participate in the Offer. If they do not, then any possible confusion generated by the December 9 Warburg press release is irrelevant to the issue of irreparable harm. The record reflects in strong terms that the existing Offer—the Offer detailed in the December 23 Offering Circular—is not now directed to United States ADR holders and they cannot participate in it. And with the Offer foreclosed to the United States ADR holders, there are no investment decisions to be made and no basis for the Court to order section 14(d) and section 14(e) disclosures. The fact that the current offer is not directed to the United States ADR holders is borne out in the Offering Circular and in all the other facts and circumstances in this record. For example, no Form of Acceptance will be accepted by Warburg if the form is postmarked from the United States. In addition, all telephone inquiries from the United States regarding the Offering Circular are answered by instructing the caller that the Offer is not being made in the United States. Finally, no GEC shares or cash will be sent to the United States in response to a tender of Plessey securities.

Second, even if it is conceded that the holder of Plessey ADRs are rightful participants in the existing Offer and are being

---

**19.** GEC contests the characterization of Plessey's ADR holders as "parties" for purposes of the irreparable harm analysis. Since the ADR holders are not named parties, GEC contends that their interests should be considered in the context of a third party interest. Plessey, however, argues that its suit is brought on behalf of its ADR holders and that this, in effect, provides the ADR holders the same status as parties in the irreparable harm analysis.

It is unnecessary for the Court to reach the legal issue of the ADR holders' status in this case. As shown in the text, even if the ADR holders are regarded as named parties, the burden to demonstrate their irreparable injury has not been met by Plessey.

injured by the "misleading" Warburg press release, Plessey has not satisfied its burden to demonstrate irreparable harm. Any possible damage resulting from the ADR holders being misled into not participating (or participating) in the existing Offer is compensable in money damages. *Gearhart Industries, Inc. v. Smith Intern. Inc.*, 741 F.2d 707, 714 (5th Cir.1984); *Schlesinger Inv. Partnership v. Fluor Corp.*, 671 F.2d 739 (2d Cir.1982); *Flynn v. Bass Bros. Enterprises, Inc.*, 456 F.Supp. 484 (E.D.Pa.1978). That, in itself, is sufficient to deny the extraordinary relief of a preliminary injunction.

The Court has considered one final factor in arriving at its decision that Plessey has not met its burden to show irreparable harm. That factor involves the long delay Plessey allowed to occur between the date of the alleged threatening injury to its ADR holders and the date it filed its present motion.

The record discloses that GEC issued its Warburg press release on December 9, 1985. Plessey, interpreting the press release as the commencement of an improper tender offer, approached the SEC about it on December 11. Plessey apparently then did nothing in the United States to protect the "valuable" rights of its ADR holders until it filed the instant motion on December 30, 1985—exactly three weeks from the date the press release issued. At that point, the Court was implored to intervene and provide extraordinary relief due to the urgency of the need to protect Plessey ADR holders.

In evaluating "irreparable harm" on a motion for a preliminary injunction, it seems appropriate to consider a party's unexplained delay in asserting its rights. The element of urgency becomes questionable when such a delay exists. *Skehan v. Board of Trustees of Bloomsburg State College*, 353 F.Supp. 542 (M.D.Pa.1973). In fact, the lack of diligence, standing alone, may preclude granting of preliminary injunctive relief because it goes to the issue of irreparable harm. *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7 (2d

Cir.1985). No prejudice need be shown by the party opposing the injunction. *See id.* at 8.

Plessey's contention of urgency at this late date seems somewhat disingenuous when one considers the substantial time period it had available to it in which to file this motion. Suffice it to say, the Court has considered this delay in reaching its conclusion that Plessey has failed to meet its burden to demonstrate irreparable harm.

## C. POSSIBILITY OF HARM TO OTHER INTERESTED PERSONS AND THE PUBLIC INTEREST

As stated earlier, there are four factors to be examined on a motion for preliminary injunction. Plessey has the burden to show (1) a reasonable probability of success on the merits and (2) irreparable injury *pendente lite* if relief is not granted. In addition to those two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Eli Lilly and Co. v. Premo Pharmaceutical Labs*, 630 F.2d at 136, *quoting Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d at 814–15.

The Court has already discussed in this Opinion the substantial comity issues raised by the nature of this case and the implications of comity on enforcement of the Williams Act. These same concerns are also relevant here in the context of a "public interest" analysis on this motion for preliminary injunction.

The public interest strongly supports denial of Plessey's motion for a preliminary injunction. First, the transaction in contest —GEC's takeover of Plessey—is an almost exclusively foreign matter. Both companies are British with the vast majority of the shareholders of both being from the United Kingdom. A combination of the two companies (or their failure to combine) will have only tangential effects in the United States. The primary and significant

consequences of the corporate merger will occur overseas.

The takeover of one corporation by another creates dramatic changes in corporate size, efficiency and management style. There may also be considerable effects on employment and the creation or elimination of facilities or major projects. In the present case, all these variables have been carefully and expertly reviewed by the various boards and agencies responsible for evaluating United Kingdom tender offers and monopolies. These boards, as do the comparable United States federal agencies, engage in the delicate and considered balancing of social interests to decide whether a particular combination of companies should be permitted and under what terms.

The public interest surely supports as little intervention as possible by a foreign government (in this case, our own) in order not to upset the considered decision of the United Kingdom government concerning how it should run its own affairs.

Significantly, neither party has illuminated the record about the effect that a grant of preliminary relief would have on the ability of the tender offer to proceed in the United Kingdom. Plessey has repeatedly made the statement that "it doesn't want to stop the tender offer," but the Court is dissatisfied with that proffer of indifference because it does not explain all of the consequences that might ensue upon issuance of an injunction. Since this is Plessey's motion for preliminary relief, it was incumbent upon it to instruct the Court about the impact of the "limited" preliminary injunction on the United Kingdom tender offer and GEC's further compliance under United Kingdom law. Plessey's failure to demonstrate that the preliminary injunction is truly "limited" raises the Court's concern about its effect on the public interest and militates against its issuance.

The issue is not all one-sided, however, because public interest considerations favoring issuance of the preliminary injunction do exist. The preliminary injunction would require GEC to make full section 14(d) and section 14(e) disclosures. This action would provide United States financial markets with complete information regarding GEC's intended acquisition of Plessey. The market could then incorporate the information in its evaluation of the price appropriate for Plessey's shares. Such an informed market response is clearly in the public interest.

In this case, there appears not to be an appreciable public interest nor a need for the information that would be supplied by section 14(d) and section 14(e) filing. As a practical matter, both the market and the SEC have already been apprised of the material facts associated with the GEC takeover bid. Plessey accomplished this itself by introducing the Warburg press release into the United States and by specifically sending the press release to the SEC. (See also the earlier discussion on the stability of prices and volume in the ADR market after December 9.)

A final public interest concern found in all cases involving enforcement of a federal statute is the full effectuation of the law. That principle clearly applies to cases under the Williams Act. However, the public interest is only served when the Act is applied in an appropriate case. As discussed earlier, there are serious concerns as to whether the Williams Act is implicated here. The conclusion must, therefore, be reached that the public interest concern in enforcement of the Williams Act should not be given considerable weight on these facts.

The Court does find the possibility of harm to interested third persons to be a considerable issue here. Again, although the matter before the Court involves the rights of Plessey ADR holders, the Court must consider the fact that the interest of 98.4% of United Kingdom holders of Plessey's equity capital might hang in the balance. We find that these foreign shareholders have a reasonable expectation that the United Kingdom tender offer transaction will go forward on the time frame established by United Kingdom law. The propriety of this finding is enforced by the fact that the fate of the takeover transaction obviously rests in the hands of the Plessey Ordinary shareholders outside the

United States. It is highly unlikely, even if Plessey should succeed on the merits of this case, that the 1.6% of the equity capital represented by United States ADR holders can affect the ultimate transaction. As a result, the Court finds a considerable third party interest which militates against my granting even this "limited" injunction.

### III. CONCLUSION

The Court concludes that Plessey has failed to demonstrate an ability to ultimately prevail on the merits of its claims that GEC has violated section 14(d) and section 14(e) of the Exchange Act. Plessey has also been unable to establish the requisite irreparable harm. In addition, the Court has considered the relevant factors of public interest and possible harm to third persons and concludes that these interests militate against the grant of a preliminary injunction.

In light of the Court's decision to deny Plessey's motion for preliminary relief, it is not necessary at this time to address GEC's motion to dismiss.

The Defendant may present an Order in form consistent with the foregoing Opinion which denies preliminary injunctive relief.