**FREEDOM NATIONAL BANK OF NEW YORK, Plaintiff,**

v.

**DANIELS & BELL, INC., Dan Bell Group, Inc., Bell, Jr., Travers J. and Bell, Sr., Travers J., Defendants.**

**81 Civ. 7641(MP).**

United States District Court, S. D. New York.

Dec. 18, 1981.

Battle, Fowler, Jaffin & Kheel, New York City by Gerald J. Fields, Raymond J. Soffientini and W. Bruce Johnson, New York City, for plaintiff.

Howard B. Sirota, New York City, for defendants.

## DECISION

MILTON POLLACK, District Judge.

At the threshold it is well to recall the standard for the issuance of a preliminary injunction.

The plaintiff must show (a) irreparable harm and (b) either, one, likelihood of success on the merits or, two, sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

This action arises out of a suit by the plaintiff, Freedom National Bank of New York, to prevent what plaintiff perceives as a takeover attempt by the defendants. Plaintiff seeks a preliminary injunction to protect its public shareholders by restraining the defendants from acquiring more of plaintiff's shares and from voting the shares they presently have, a total of about eight percent of the voting power of the company. Plaintiff alleges, first, the de-

fendants made false statements in their filings under Section 13(d) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78m(d) by claiming that their purchases of Freedom stock were for "investment" purposes when the purchases allegedly were actually part of a plan to acquire control of plaintiff; second, that defendants made, in effect, a tender offer without complying with Section 14(d) of the Exchange Act, as amended, 15 U.S.C. § 78n(d), and, third, that the defendants traded in plaintiff's common stock without disclosing their intention to shareholders in violation of Section 10(b) of the Exchange Act, 15 U.S.C., Section 78j(b), Rule 10b–5, and Section 14(e), 15 U.S.C. Section 78n(e).

On December 10, 1981, on an application for a temporary restraining order, Judge Gagliardi in Part 1 signed a stipulation by the defendants that they would not acquire any shares of plaintiff's stock, would not vote their shares or solicit other stockholder's proxies, and would take no other steps to acquire control of plaintiff pending the resolution of this application and/or the trial.

▐ Plaintiff seeks a preliminary injunction to preserve that state of affairs until the outcome of the trial. At the threshold, it is clear that a preliminary injunction ought not to issue on plaintiff's 10(b) claim, since as an issuer the plaintiff lacks standing to bring that claim.

▐ *Freedom is a national bank with its* principal offices in Harlem and a branch office in Bedford Stuyvesant. It is the only black-owned and operated commercial bank in New York. The bank has 94,018 shares of common stock outstanding, which are registered pursuant to Section 12 of the Exchange Act and are publicly traded in the over-the-counter market.

Plaintiff has approximately 1,770 shareholders, 90 percent of whom own 25 or fewer shares.

Plaintiff alleges that as of January 1, 1981, defendant Daniels & Bell, Inc., (hereafter "D&B"), a broker-dealer and member of the New York Stock Exchange, owned

1,260 shares of plaintiff's common stock, and that by March 1981, D&B owned 5,290 shares. D&B was the record owner and Dan Bell, D&B's parent company, was the beneficial owner.

By March 13, defendant Travers Bell, Jr., chairman of the board of both D&B and Dan Bell, filed a form F–11 and F–11–A under Section 13(e) of the Exchange Act in which he characterized D&B's purchases of what now amounted to about five and a half percent of plaintiff's shares as for investment purposes.

On March 16, 1981, Bell, Jr. requested the appointment of defendant Travers Bell, Sr., a director of both D&B and Dan Bell, to Freedom's board of directors at the annual meeting scheduled for May 9, 1981. Two days before, that is, May 7, 1981, Bell, Sr. resigned his position as a director of D&B, a broker-dealer, so that he could serve as a director of plaintiff bank.

On May 9, 1981, by virtue of cumulative voting rights attached to D&B's shares of the plaintiff, Bell, Sr. was elected director of the plaintiff and continues to serve.

In May and June of 1981, D&B made mail solicitations to numerous shareholders claiming that it was a market maker in Freedom National Bank stock and offering $10.50 a share.

Although characterized as a premium price, there is no evidence before the Court at this time as to how much of the alleged premium inhered to the $10.50.

Plaintiff further alleges that in mid-October 1981 the defendants made a firm written offer to Bedford Stuyvesant Restoration Corporation, (hereafter "Bedford Stuyvesant"), for all of its 10,000 non-voting convertible preferred stock on an all-cash basis, the offer to be kept open only a limited period of time. That stock, when converted, would yield approximately 25 percent of the outstanding voting stock of the plaintiff.

In late October 1981, and continuing to the present, defendants have been allegedly soliciting stock from plaintiff's shareholders by mail, offering $15 per share, which is, possibly, $2 above the market price.

The plaintiff has named eight shareholders to have been thus solicited, some of whom own only four and six shares, the largest owns 40 shares, and says that a random sampling of ten other holders who own 60 or fewer shares revealed that all of these persons had been solicited.

At plaintiff's board of directors meeting on December 4, 1981, defendant Bell, Sr. was asked what defendant D&B's plans were in making these solicitations. He allegedly replied that it appeared good business for banks and brokerage firms to be combining.

Following the board meeting, D&B formally requested a list of shareholders of plaintiff.

It has been revealed on this hearing that on November 25th a group of the directors of the plaintiff prepared for filing, or had prepared for filing, an F–11 statement with the controller of the currency indicating that they had acquired the 10,000 shares of preferred stock owned by Bedford Stuyvesant in pursuance of an earlier arrangement that they apparently negotiated and now own at least that 25 percent of the voting strength of the plaintiff in addition to some six percent of the stock which they previously held, for a total of about 31 percent of the voting strength.

The purpose of that acquisition from Bedford Stuyvesant, as stated, was allegedly the prevention of permitting Bell to take control of the bank. It appears from the presentation here that the public market in this stock is inactive.

The plaintiff claims that the defendants have engaged in tender offers within the meaning of the Exchange Act, a term which is nowhere defined in the Act or the regulations.

In the most recent Second Circuit decision on this issue, *Kennecott Copper Corporation v. Curtiss-Wright Corporation*, 584 F.2d 1195 (2d Cir. 1978), the Court held that Curtiss-Wright's purchases made before it became a five percent holder did not constitute a tender offer under the terms of the

Act. The Court adhered to the definition of a conventional tender offer set forth in the legislative history of the Act, which was, "the offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met."

That definition appeared in a quotation set forth in the *Kennecott Copper* case at page 1206, from H.R.Rep.No.1711, 90 Cong. 2d Sess., *reprinted in* [1968] U.S.Code Cong. & Ad.News, 2811.

The *Kennecott Copper* Court noted that it had not yet moved as far as other courts in extending the Williams Act provisions to other unique methods of stock acquisition which exert pressure on shareholders to make uninformed, ill-considered decisions to sell.

The SEC has compiled some eight factors which have elaborated on the definition quoted above that have been repeated in two of the cases decided in this District, *Brascan, Ltd. v. Edper Equities, Ltd.*, 477 F.Supp. 773, 791, n.13 (S.D.N.Y.1979); *Wellman v. Dickinson*, 475 F.Supp. 783, 823–24 (S.D.N.Y.1979).

The eight factors compiled by the SEC are: one, active and widespread solicitation of public shareholders for the shares of an issuer; two, solicitation made for a substantial percentage of the issuer's stock; three, offer to purchase made at a premium over the prevailing market price; four, terms of the offer are firm rather than negotiable; five, offer contingent on the tender of a fixed number of shares often subject to a fixed maximum number to be purchased; six, offer open only a limited period of time; seven, offeree subjected to pressure to sell his stock; eight, public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target's securities.

In *Brascan, supra* at 789, the Court appositely stated, "[defendant's] conduct had very little similarity to what is commonly understood as a tender offer and what was described as a tender offer in the context of the hearings leading to the passage of the Williams Act. Edper did not engage in widespread solicitation of stockholders. Indeed, it had scrupulously avoided any solicitation upon the advice of its lawyers. Its purchasing was not contingent on a minimum fixed number of shares being offered, it did not put out an offer at a fixed price and the form of the transaction did not provide for tenders by the selling shareholders to be held for some period of time. . . . What Edper did was to acquire a large amount of stock in open market purchases, bidding cautiously so as to avoid bidding up the price of the stock to excessive levels unless there was large volume available at such prices. This is not a tender offer."

It is contended by the plaintiff herein that the buying program described by the plaintiff which began in May and June of 1981, and resumed again more intensely in October of 1981 meets all of the definitions set forth in the foregoing.

The answer as to whether this buying program constitutes a tender offer is certainly not clearcut. Some of the eight characteristics are present. Some are present only with respect to Bedford Stuyvesant.

It sufficiently appears in the evidence before the Court and the admissions of the plaintiff on this application that the issue necessitating consideration of a provisional remedy in the form of an injunction is not merely the completeness or propriety of the filings with the controller of the currency. It further sufficiently appears that the plaintiff's likelihood of success on ultimate trial in view of the controlling position which the insiders of the company now hold is cloudy, to say the least.

There are no really serious questions involved. Nor does the balance of hardships tip in favor of the plaintiff. There is no threat of irreparable harm to the plaintiff or to the public shareholders or to the control of the bank by what has occurred.

There is no reasonable possibility of a shift in control of the bank pending trial of this case, no threat of irreparable damage to the public shareholders pending the trial.

Accordingly, the application for a preliminary injunction is in all respects denied. The temporary restraining order is in all respects vacated and this case will be set for early trial upon the Court being advised when the pretrial proceedings have been appropriately completed by the parties and proposed findings of fact and conclusions of law have been prepared for submission for the Court's consideration.

The foregoing shall constitute the findings of fact and conclusions of law required under Rule 52(a) Federal Rules of Civil Procedure.

SO ORDERED.