**JOHN LABATT LIMITED, Plaintiff,**

v.

**ONEX CORPORATION, LBT Acquisition Corporation and Quilmes Industrial, S.A., Defendants.**

**No. 95 Civ. 3828 (MP).**

United States District Court, S.D. New York.

June 8, 1995.

Douglas S. Liebhafsky, David Gruenstein, Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff.

Douglas D. Broadwater, Max R. Shulman, Cravath, Swaine & Moore, New York City, for defendant Onex Corp. and LBT Acquisition Corp.

Thomas P. Ogden, Davis, Polk & Wardwell, New York City, for defendant Quilmes Industrial, S.A.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

MILTON POLLACK, Senior District Judge:

I. FINDINGS OF FACT

A *The Parties.*

1. Plaintiff John Labatt Limited ("Labatt") is a Canadian corporation with its

principal place of business in Toronto, Ontario.

2. There are two main segments to Labatt's business: "Brewing" and "Broadcast, Sports and Entertainment". The Broadcast, Sports and Entertainment segment includes, among other things, The Sports Network, The Discovery Channel (80%–owned) and Major League Baseball's Toronto Blue Jays (90%–owned).

3. Labatt is a publicly traded company in Canada. Labatt shares are listed and posted for trading on The Toronto Stock Exchange, The Montreal Exchange and the Vancouver Stock Exchange.

4. Labatt shares are not listed or posted for trading on the New York Stock Exchange or on any other market in the United States.

5. There are no Labatt American Depository Receipts ("ADRs") listed or posted for trading on any U.S. stock exchange, on the National Association of Securities Dealers Automated Quotation System ("NASDAQ") or on any other market in the United States.

6. According to Labatt, approximately 12% of Labatt's shares are owned by U.S. persons. Like all Labatt stock, the shares held by U.S. persons are traded only on the Canadian stock exchanges identified in paragraph 3, *supra.*

7. Labatt, as a foreign private issuer, has opted under Securities and Exchange Commission ("SEC") Rule 12g3–2(b) to furnish the SEC with certain information including any disclosures it is required to make under Canadian law and any filings required by stock exchanges on which Labatt shares are listed. By doing so, Labatt is able to exempt itself from having to register its shares under Section 12 of the Securities Exchange Act of 1934 (the " '34 Act"), 15 U.S.C. § 78l. Tender offers for the shares of companies exempt from Section 12—like Labatt—are exempt from the disclosure and substantive requirements of Section 14(d) of the '34 Act, 15 U.S.C. § 78n(d).

8. Defendant Onex Corporation ("Onex") is a Canadian corporation with its principal place of business in Toronto, Ontario.

9. Onex is a diversified company, the subordinate voting shares of which are listed and posted for trading on The Toronto Stock Exchange and The Montreal Exchange.

10. Onex shares are not listed or posted for trading on the New York Stock Exchange or on any other market in the United States.

11. Defendant LBT Acquisition Corporation ("LBT") is a Canadian corporation with its principal place of business in Toronto, Ontario. It was incorporated on February 9, 1995, and was organized solely for the purpose of acquiring Labatt. A total of C$937.5 million has been committed to capitalize LBT, of which Onex, through its affiliates, will contribute C$173.5 million.

12. LBT is a wholly-owned subsidiary of LBT Acquisition Holdings Corporation ("LBT Holdings"), a Canadian corporation with its principal place of business in Toronto, Ontario. LBT Holdings is a wholly-owned subsidiary of defendant Onex.

13. Defendant Quilmes Industrial, S.A. ("Quinsa") is a Luxembourg holding company that owns 85% of Quilmes International (Bermuda) Limited ("QIB"). QIB is the leading brewer in the southern cone of South America, with operations in Argentina, Chile, Paraguay and Uruguay. Quinsa has committed to supply capital for LBT's tender offer by purchasing C$312.5 million in convertible notes of LBT Holdings.

B. *Labatt's Attempt to Adopt a "Poison Pill".*

14. In July 1994, Labatt's Board of Directors adopted a shareholder rights plan (or "poison pill"), which would have granted Labatt management certain defenses against an unwelcome takeover bid.

15. Labatt management submitted the poison pill to Labatt shareholders for approval, as required by Canadian securities regulatory policies. At a shareholders' meeting on September 13, 1994, Labatt shareholders rejected the poison pill.

C. *LBT's Tender Offer for All Labatt Stock Held by non-U.S. Shareholders.*

16. On May 18, 1995, LBT commenced a tender offer (the "Offer") under the Canadi-

an securities laws to acquire all Labatt common shares, excluding any Labatt shares held by or on behalf of U.S. persons.

17. As Labatt concedes, under its express terms, LBT's Offer is not open to U.S. persons.

18. LBT's Offer and Circular, along with other Offer documentation, clearly state that U.S. persons are excluded from the Offer and that LBT will not accept tenders made by or on behalf of U.S. shareholders:

"The Offer is not being made to, nor will deposits of Shares be accepted from or on behalf of, U.S. persons or other holders of Shares in any jurisdiction, including the United States, in which the making of the Offer or acceptance thereof would not be in compliance with the laws of such jurisdiction." (Offer and Circular at 2.)

19. All Labatt shareholders accepting the Offer must make the following declaration in their Letter of Transmittal:

"The undersigned hereby declares that the undersigned (a) is not a U.S. person (as defined in Section 3 of the Offer), (b) is not acting for the account or benefit of any U.S. person and (c) is not in, or delivering this Letter of Acceptance and Transmittal from, the United States (as defined in Section 3 of the Offer)."

20. This certification is structured from the safe harbor provisions of SEC Regulation S, which outlines the permissible ways of making an exchange offer outside the United States that is not subject to the registration requirements of the Securities Act of 1933 (the " '33 Act"). The definition of U.S. person precluded from tendering into the LBT Offer is found in Regulation S. Labatt concedes that neither Section 14(d) of the '34 Act nor SEC Regulation 14D applies to the Offer.

21. In the Labatt Directors' Circular, which Labatt sent to all shareholders on May 29, 1995, Labatt acknowledged that "[p]ursuant to its terms, the offer is not extended to Labatt shareholders resident in the United States" and actually criticized LBT's offer because it allegedly "unfairly discriminates against [U.S.] holders in that they are not being offered an opportunity … to participate in the offer".

22. Tender offers in Canada must remain open for 21 calendar days. Thus, originally the Offer was to remain open until June 9, 1995. However, to reflect a decision of a Canadian court on June 2, 1995, LBT issued a Notice of Change and Variation on June 2 that extended the Offer to June 13, 1995, at 8:00 a.m.

23. As disclosed in LBT's Offer and Circular, if the Offer is successful, LBT intends to acquire the remaining Labatt shares (including all U.S.-held shares) pursuant to a "second step" transaction in which shareholders who have not tendered (or were not eligible to tender) pursuant to the Offer will receive substantially the same consideration for their shares as shareholders who did tender.

24. Also as disclosed in LBT's Offer and Circular, if the Offer is successful, LBT intends to sell Labatt's broadcast, sports and entertainment businesses, as well as certain of Labatt's non-core brewing assets, in order to refocus Labatt as a North American brewing company.

25. The Offer provides for consideration of C$24.00 per tendered share, comprised of C$21.25 in cash and C$2.75 in Cash Collateralized Notes ("Notes").

26. LBT structured its offer to include Notes to address the policy of the Canadian Radio-television and Telecommunications Commission ("CRTC") that prohibits persons who directly or indirectly purchase broadcast assets regulated by the CRTC from shortly thereafter reselling such assets to obtain a financial gain.

27. All the funds required to pay for the Labatt shares in cash will be disbursed by LBT, except for a portion of the funds which will be transferred to a trustee pursuant to the terms of a note indenture under which the Notes are to be issued.

28. The Notes will be direct secured obligations of LBT and will be fully secured by the deposit of cash in the amount of the principal amount of the Notes. The trustee will invest that cash in 30–day treasury bills issued by the Government of Canada or in

equivalent debt securities of, or guaranteed by, a Schedule I Canadian chartered bank.

### D. *LBT Did Not Solicit Labatt's U.S. Shareholders.*

29. On May 18, 1995, LBT held a press conference in Toronto to announce the Offer. No U.S. news organization was invited to the May 18 press conference. However a representative of *The Wall Street Journal* may have attended the conference.

30. Press releases issued by LBT have stated that they are "NOT FOR RELEASE IN THE UNITED STATES", and the agency distributing press releases for LBT has deleted from the LBT distribution list the only U.S. company that appears on its media advisory list.

31. There is no evidence that LBT conducted any U.S. press conferences or issued any U.S. press releases in connection with the Offer. Nor is there evidence that LBT attempted to stimulate any U.S. media coverage of the Offer.

32. LBT is not buying Labatt shares on the market in Canada—from either Canadian or U.S. shareholders.

33. On May 18, 1995, Quinsa issued a press release concerning its participation in the financing of LBT, which it distributed over BusinessWire and at the LBT press conference.

34. The press release was disseminated by Quinsa in order to communicate with the owners of its shares, which are held in bearer form, that the company was investing US$230 million in the Offer. This represented a very significant investment for Quinsa, the annual sales of which approximate US$700 million.

35. Quinsa also felt that a press release was necessary to inform securities analysts in Europe, North America and South America that the company's participation in the LBT financing was consistent with Quinsa's strategy of geographical diversification.

36. The Quinsa press release was not intended to promote the LBT Offer or to solicit tenders by U.S. shareholders.

37. Much of the publicity about LBT's Offer that has appeared in the financial press in the United States has been generated by Labatt itself. For example, Labatt's management has granted a number of interviews and has made several statements to the U.S. financial press.

38. LBT did not mail any offering documents (*i.e.*, the Offer and Circular, the Letter of Acceptance and Transmittal, and the Notice of Guaranteed Delivery) to any Labatt shareholders having an address of record in the United States and did not cause others to mail those documents to U.S. shareholders.

39. A trader at a Montreal securities dealer, First Marathon, one of the soliciting dealers under the Offer, apparently contacted a U.S. firm, Southeastern Asset Management Inc., which is a large holder of Labatt shares, to discuss the Offer. First Marathon also apparently sent certain Offer documents to Southeastern. However, there is no evidence that LBT knew of, caused or authorized any of this activity.

40. Gordon Capital Corporation, the dealer manager for the Offer, sent a memorandum to all members of the Investment Dealers Association of Canada (including First Marathon) who wished to participate in the soliciting dealer group. The memorandum contained the following legend:

> **"Please note that this Offer is not being made to U.S. clients, and *NO DOCUMENTS* are to be sent to U.S. residents."**

41. It is a breach of their soliciting dealer agreements for soliciting dealers to solicit United States persons to tender into LBT's Offer. Those dealers will not be compensated by LBT for tenders by U.S. shareholders.

42. The Canadian Depository for Securities ("CDS") acts as a clearinghouse for transactions executed on the Canadian exchanges and serves as depositary for most of the shares so cleared.

43. CDS in turn is comprised of its participating clearing firms ("CDS Participants"), which are principally Canadian banks, brokerage houses or similar financial institutions, or the Canadian affiliates of those institutions overseas. CDS Partici-

pants hold shares for the benefit of the ultimate investors, wherever they may reside.

44. Notwithstanding the ineligibility of U.S. shareholders to tender into LBT's Offer, one or more CDS Participants may have sent the Offer and Circular to all of their underlying beneficial shareholder clients, including those in the United States. This may have occurred at the Toronto Dominion Bank (or its affiliates) and at the Canadian Imperial Bank of Commerce ("CIBC"). However, there is no evidence that LBT authorized or even knew of these mailings to U.S. shareholders.

45. According to Tony Presutti, CIBC's Manager of Entitlements and Debt Products, who was called as a witness by Labatt:

(a) the bulletins that CIBC received from LBT's mailing agent regarding the Offer specified:

(i) "The offer is not being made to residents of the United States of America"; and

(ii) "The offer is not being made to residents of the United States of America or in any jurisdiction in which the making of the offer, or acceptance thereof, would not be in compliance with the laws of such jurisdiction";

(b) attached to the bulletins was the declaration that tendering shareholders are not U.S. persons or acting on behalf of U.S. persons;

(c) CIBC was not authorized by LBT to forward any offering documents to U.S. shareholders and did not clear this activity with defendants;

(d) CIBC forwarded the offering documents pursuant to its contractual "safekeeping" agreements with its clients because CIBC believed it to be in the financial interests of CIBC and its clients, and because it would have been a breach of the "safekeeping" agreements for CIBC not to do so;

(e) since some of CIBC's U.S. clients are banks acting in a custodial capacity whose beneficial clients might not be U.S. residents, the fact that the offering documents were sent to a U.S. address

does not mean that the ultimate beneficial owner is a U.S. shareholder;

(g) in forwarding the offering documents to its clients, CIBC informed them that U.S. shareholders are not eligible to tender; and

(h) CIBC did not intend to induce U.S. shareholders, who are not eligible to tender, to do so in violation of the terms of the Offer.

46. Similarly, Roy Shanks, Vice President of the Proxy Solicitation Company Limited, which serves as an Information Agent to Labatt, stated in an affidavit submitted by Labatt that, based on his discussions with CDS Participants, "in all likelihood, the offeror [LBT] and its representatives did not take steps to request CDS Participants to send the Offering Circular to U.S. shareholders".

47. Labatt argues that certain members of the soliciting dealers group for LBT might have contacted U.S. shareholders regarding the Offer. That, however, could not have been done at the instance of LBT, because any such solicitation would have breached the soliciting dealer agreement with LBT. And, even if some unauthorized solicitations occurred, it would not alter the fact that LBT will not accept any shares tendered by U.S. shareholders and will not compensate soliciting dealers for tenders by U.S. shareholders.

E. *Governing Canadian Law and Regulations.*

48. Takeover bids in Canada are regulated by provincial securities legislation, such as the Securities Act (Ontario), R.S.O. 1990, c. S.5, as amended (the "Ontario Securities Act"), and, if the takeover target is incorporated under the Canada Business Corporations Act, R.S.C. 1985, c. C–44 (the "CBCA"), by the CBCA as well. Labatt is incorporated under the CBCA. The corresponding regulations are the Ontario Securities Regulations, R.R.O. 1990, Reg. 1015, and the Canada Business Corporations Regulations, SOR/79–316.

49. Like the securities laws of the United States, Canada's securities regulatory scheme protects investors through, among other things, extensive disclosure require-

ments. In adopting the Multijurisdictional Disclosure System ("MJDS") with Canada, the SEC has recognized Canada's "strong regulatory tradition" and "the similarities between U.S. and Canadian securities laws". Multijurisdictional Disclosure, Securities Act Release No. 6841, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 84,432, at 80,282, 80,288 (July 26, 1989).

50. Neither the CBCA nor the Ontario Securities Act requires that a tender offer be made to all shareholders of the target corporation. Section 95(1) of the Ontario Securities Act provides that a tender offer shall be made to all holders of the securities who are in Ontario. Section 198 of the CBCA requires that the bid be sent, *inter alia,* to each shareholder of the target corporation resident in Canada.

51. There is no requirement under Canadian law that a tender offer include U.S.-held shares of the target corporation. The Ontario Securities Commission has recognized

"that there are different regulatory regimes in the provinces of Canada and in the United States under the Federal securities laws. There are many similarities, but there are many differences and an offeror may have legitimate reasons for not wishing to make its offer in another jurisdiction and submit itself to a different regulatory regime." *In re Gulf Canada Corporation and Hiram Walker Resources Ltd.* (1986), 9 OSCB 1903.

### F. *Canadian Proceedings Relating to LBT's Tender Offer.*

52. Labatt does not contend here that the proposed takeover is not permitted by Canadian authorities and regulations.

53. Labatt concedes that any questions regarding the validity of the Offer under Canadian law are being litigated in Canadian legal proceedings.

54. Labatt is currently challenging the validity of LBT's Offer in three Canadian fora: the Ontario Court (General Division); the Ontario Securities Commission; and The Toronto Stock Exchange.

55. On June 2, 1995, the Ontario Court (General Division) entered a judgment that set aside the order permitting LBT to use compulsory acquisition rights under the CBCA if LBT acquires 90% of the Labatt shares. Under the amended order, those rights are no longer available to LBT. As a result, late on June 2, 1995, LBT had to issue a "Notice of Change and Variation of the Offer to Purchase Common Shares of John Labatt Limited", which required an extension of the Offer until 8:00 a.m. on June 13, 1995. The Notice of Change and Variation does not alter LBT's plans to exclude U.S. shareholders from the Offer or to acquire all shares that remain outstanding in a "going private" transaction if the Offer is successful.

### G. *The Proceedings In this Court.*

56. On May 25, 1995, Labatt brought the present action in this Court alleging, on information and belief, violations of Section 14(e) of the '34 Act and Section 5 of the '33 Act, 15 U.S.C. § 77e. On May 31, 1995, Labatt added a claim under Section 10(b) of the '34 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder.

57. In its Amended Complaint, Labatt alleges, on information and belief, that defendants violated U.S. securities laws by: (a) failing to send the Offer and Circular to all U.S. persons holding Labatt shares; (b) failing to hold the Offer open to all shareholders including all U.S. holders of Labatt shares; and (c) keeping the Offer open only for the 21 calendar days required by Canadian law rather than the twenty business days provided by Rule 14e–1(a) in the United States.

58. Labatt seeks to have this Court issue an injunction that: (a) requires LBT to comply with the timing provisions of Rule 14e–1(a); (b) requires LBT to make disclosures to Labatt's U.S. shareholders of the type that are mandated by Section 14(d) of the '34 Act; and (c) requires Labatt to register, under the '33 Act, the Notes being offered as part of the consideration for the Offer.

59. On May 25, 1995, Labatt filed a motion for an order to show cause and temporary restraining order. Following a hearing on May 26, 1995, the motion for a temporary restraining order was denied and a hearing

on the motion for preliminary injunction was set for June 2, 1995.

60. Labatt has elected to take no discovery from defendants in connection with this matter.

61. Labatt has made no specific allegations of false or misleading statements or material omissions by any defendant in connection with the Offer.

62. Labatt has presented no evidence on this motion that would indicate any fraud attributable to defendants.

63. Based on the evidence submitted on the motion, it is unlikely that Labatt's U.S. shareholders were deprived of material information concerning the Offer or were materially misled about the Offer. Canadian law requires Labatt to include in the Directors' Circular (sent to all U.S. shareholders) any information that "would reasonably be expected to affect the decision of the securityholders ... to accept or reject the offer". Moreover, the Circular itself represented that it "contained no untrue statement of a material fact and did not omit to state a material fact that was required to be stated or that was necessary to make a statement not misleading in light of the circumstances in which it was made".

64. There is substantial evidence indicating that Labatt is engaged in an auction of the company and that Labatt's motivation in bringing this lawsuit is to prevent or delay consideration of the Offer by Labatt's shareholders in order to allow more time to find an alternative bidder for the company, *i.e.*, a "white knight". Indeed, Labatt admits that its management is busily engaged in finding a white knight.

65. The shares of Labatt are traded only on Canadian stock exchanges; they are neither traded in the United States nor registered under the '34 Act. No ADRs are traded here or held by United States residents. According to Labatt, 12% of its shareholders, at most, are located in the United States.

66. By its express terms, the LBT tender offer is not open to Labatt's U.S. shareholders. As allowed by Canadian law, tenders are not being solicited—and will not be accepted—from or on behalf of United States residents.

67. LBT's Offer is being made pursuant to SEC Regulation S, entitled "Rules Governing Offers and Sales Made Outside the United States Without Registration under the Securities Act of 1933". Regulation S is a "safe harbor" provision of the United States securities laws that permits exchange offers outside the United States that are not open to U.S. shareholders.

68. Labatt concedes that because its shares are exempt from registration in the United States, Section 14(d) of the '34 Act does not apply, including the disclosure requirements thereunder and the requirement that a tender offer be open to all shareholders.

69. Nonetheless, Labatt asserts that, under Sections 14(e) and 10(b) of the '34 Act, jurisdiction exists in this Court and that, even though LBT is not making a tender offer to U.S. shareholders, the Court should issue a preliminary injunction that would require LBT to: (a) provide disclosure to U.S. shareholders of the terms of the tender offer similar to the type of disclosure that is required under Section 14(d) of the '34 Act; (b) conduct the tender offer in compliance with the administrative timing provision of Rule 14e–1 promulgated under the '34 Act (requiring that a tender offer be open for 20 business days rather than the 21 calendar days provided by Canadian law); and (c) register, under the '33 Act, the Notes that LBT is providing as part of the tender offer consideration, which registration would have to be completed before disclosure of the Offer could be made to U.S. shareholders, thereby delaying the Offer by at least several months.

*The Standard for Issuance of a Preliminary Injunction.*

70. In seeking the extraordinary relief of a preliminary injunction, Labatt (as the moving party) bears the burden of proving (a) irreparable harm and (b) either (i) a likelihood of success on the merits or (ii) both sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decid-

edly in favor of the injunction. *ICN Pharmaceuticals, Inc. v. Khan,* 2 F.3d 484, 490 (2d Cir.1993).

71. Courts are reluctant to permit targets of tender offers to use preliminary injunctions as a tool to delay or defeat legitimate tender offers. *Hanson Trust PLC v. SCM Corp.,* 774 F.2d 47 (2d Cir.1985). As the Second Circuit has cautioned:

> "[T]he preliminary injunction ... is one of the most drastic tools in the arsenal of judicial remedies [and] must be used with great care, lest the forces of the free marketplace, which in the end should determine the merits of takeover disputes, are nullified". *Id.* at 60 (citation omitted).

72. In this case, Labatt is requesting a mandatory injunction. *See Securities & Exchange Commission v. Research Resources, Inc.,* No. 85 CIV. 3530, 1986 WL 11446, at *4, Fed.Sec.L.Rep. ¶ 92,954 (S.D.N.Y. Oct. 8, 1986) (mandatory injunction issued to require reports with registration statement); *Securities & Exchange Commission v. Union Corp. of America,* 205 F.Supp. 518, 522 (E.D.Mo.1962) (same), *aff'd,* 309 F.2d 93 (8th Cir.1962). Accordingly, its burden is even higher than in the usual preliminary injunction case. *Securities & Exchange Commission v. Unifund SAL,* 910 F.2d 1028, 1039 (2d Cir.1990).

73. Mandatory injunctions are not granted " 'unless extreme or very serious damage will [otherwise] result and are not issued in doubtful cases' ". *Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n,* 641 F.Supp. 1179, 1190 (S.D.N.Y.1986) (quoting *Clune v. Publishers' Ass'n,* 214 F.Supp. 520, 531 (S.D.N.Y.), *aff'd per curiam on opinion below,* 314 F.2d 343 (2d Cir.1963)).

74. For the reasons discussed below, Labatt has failed to meet its burden of justifying the injunction that it seeks.

*Labatt's Claims Under Section 14(e) of the '34 Act.*

75. Labatt has failed to establish the likelihood that jurisdiction exists over its claims under Section 14(e) of the '34 Act.

76. The antifraud provisions of Section 14(e) prohibit any false or misleading statements made "in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders ...". 15 U.S.C. § 78n(e).

77. Media interest in the LBT announcement was inevitable. There is no cognizable evidence that LBT affirmatively invited any U.S. journalists to the May 18 press conference. Indeed, the evidence shows that U.S. press entities were not included on LBT's list of invitees and that the LBT press release announcing the bid, as well as other LBT press releases concerning the Offer, explicitly stated that they were "NOT FOR RELEASE IN THE UNITED STATES".

78. With regard to the Quinsa press release, Quinsa's press consultant, John P. Kehoe, who was called as a witness by Labatt, testified that the release was distributed because Quinsa "has $700 million in sales, and it was investing $200 million in this transaction", so "it was incumbent upon them ... to communicate [to their shareholders] exactly why they were doing it". (Hearing Tr. at 55.) Accordingly, Quinsa sent the press release where it reasonably believed its shareholders resided—which included Europe, South America, Latin America and the United States. There is no evidence that the press release was disseminated at the request of LBT, was specifically targeted at Labatt's U.S. shareholders or was issued for the undisclosed purpose of extending the LBT Offer to Labatt's U.S. shareholders.

79. Labatt argues that certain nominee banks forwarded copies of LBT's offering documents to their clients in the United States. Once again, however, there is no evidence that this was done on behalf of LBT or for the purpose of extending the LBT Offer to U.S. residents. Indeed, the evidence is to the contrary.

## II. CONCLUSIONS OF LAW

80. LBT is a Canadian company that is making a tender offer in Canada for another Canadian company, Labatt, in accordance with Canadian Law. Labatt concedes that the tender offer is permitted under Canadian regulations and that any questions regarding the tender offer's validity are being litigated in Canada pursuant to Canadian law.

81. Section 14(e) is designed to ensure that shareholders confronted with a tender offer have adequate and accurate information on which to base their decision whether or not to tender their shares. *Piper v. Chris–Craft Indus., Inc.,* 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975).

■ 82. A necessary predicate to a claim under Section 14(e) is the existence (either imminent, pending or recent) of a tender offer. *Stromfeld v. Great Atlantic & Pacific Tea Co.,* 496 F.Supp. 1084, 1088–89 (S.D.N.Y.) ("Section 14 is simply not applicable" where the plaintiff is neither confronted with a tender offer nor required to respond to one), *aff'd,* 646 F.2d 563 (2d Cir.1980). Absent the existence of a tender offer, there can be no fraud "in connection with" a tender offer. *See Lewis v. McGraw,* 619 F.2d 192, 195 (2d Cir.), *cert. denied,* 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). Where shareholders are "never presented with th[e] critical decision" of whether or not to tender, "a vital element of a § 14(e) claim" is missing. *Panter v. Marshall Field & Co.,* 646 F.2d 271, 283–84 (7th Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

83. "Although the Williams Act does not define the term 'tender offer,' the characteristics of a typical offer are well-recognized. They are described in the House Report of the Committee on Interstate and Foreign Commerce, which held hearings on the proposed Act.

> 'The offer normally consists of a bid by an individual or group to buy shares of a company usually at a price above the current market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.' "

*Kennecott Copper Corp. v. Curtiss–Wright Corp.,* 584 F.2d 1195, 1206 (2d Cir.1978) (citation omitted).

■ 84. In the current case, neither of the defining characteristics of a tender offer identified in *Kennecott* is present insofar as U.S. shareholders are concerned. It is conceded that, under the express terms of LBT's Offer, tenders are not being solicited from U.S. residents and tenders will not be accepted from or on behalf of U.S. residents. Each shareholder accepting the Offer must certify that he or she is not a U.S. person who would be excluded from the Offer.

85. Where, as here, a tender offer is totally foreign and neither solicits nor will accept tenders by U.S. shareholders, it is not a tender offer directed to U.S. shareholders and the threshold jurisdictional requirement of Section 14(e) is not met. *See Plessey Co. plc v. General Electric Co. plc,* 628 F.Supp. 477 (D.Del.1986) (refusing to apply Section 14(e) to a tender offer in Great Britain involving two British companies, even though the offer was open to U.S. shareholders).

86. Labatt tries to avoid the authorities on the ground that the exclusion of U.S. shareholders from LBT's Offer "is just being done with a very big wink". (Hearing Tr. at 13.) Labatt recognizes that to prevail on this argument it must prove that " 'no' means 'yes' " (Hearing Tr. at 85)—*i.e.,* that when LBT says that U.S. shareholders are not invited into the Offer, it really means that they are. Labatt has demonstrated neither a likelihood of success on that point nor that it presents a fair ground for litigation. No circumstances given by Labatt upon which it relies, taken alone or in combination, is sufficient to negate the express terms of the LBT Offer excluding U.S. shareholders.

■ 87. Nothing in the U.S. securities laws requires a foreign tender offeror to exclude U.S. press coverage in order to avoid U.S. regulation of its foreign offer. *See* Regulation S, Preliminary Notes ¶ 7. As the court stated in *Plessey,* in refusing to apply the Williams Act to a foreign tender offer even though publicity about the transaction had appeared in *The Wall Street Journal:*

> "[W]here a foreign bidder has steadfastly avoided American channels in its pursuit of a foreign target, the American interest in extensive disclosure appears minimal. Where the only acts within the United States are second hand news accounts not

directly attributable to the bidder, the American contact which would justify an exercise of jurisdiction is relatively small and counsels against its use." 628 F.Supp. at 495.

■ 88. Labatt argues that Section 14(e) applies because, despite the exclusion of U.S. persons from the tender offer, the Offer might influence such persons to sell their shares on the open market. The Second Circuit rejected that very argument in *Kennecott*. 584 F.2d at 1206–07. It was also rejected by the Seventh Circuit in *Panter*, which held that "the sole purpose of § 14(e) is protection of the investor faced with the decision to tender or retain his shares", and that whatever the factors are that might influence a shareholder to retain or sell on the open market outside a tender offer, they are not "the proscribed pressures the Williams Act was designed to alleviate". 646 F.2d at 285–86.

89. Labatt also argues that Section 14(e) applies under the Second Circuit's holding in *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252 (2d Cir.), *cert. dismissed,* 492 U.S. 939, 110 S.Ct. 29, 106 L.Ed.2d 639 (1989). That case, however, is distinguishable from this one. Most particularly, in *Gold Fields,* unlike here, the tender offer was made to U.S. shareholders, who held ADRs and whose shares, under the express terms of the offering documents, could be tendered into the offer. *Id.* at 256. In addition, the offeror took affirmative steps to cause the offering documents to be sent to U.S. residents—something that LBT has sought to avoid in this case. In *Gold Fields,* the offeror provided the offering documents to extraterritorial nominees of the U.S. shareholders, knowing that the nominees were required by law to forward the documents to shareholders and ADR depository banks in the United States. *Id.* at 256, 262. Thus, in contrast to the present case, *Gold Fields* involved both the solicitation and the acceptance of tenders by U.S. shareholders—which brings it squarely within the defining characteristics of a tender offer as described by the Second Circuit in *Kennecott.*

90. The other case primarily relied upon by Labatt—*Itoba Limited v. Lep Group,*

*PLC,* 54 F.3d 118 (2d Cir.1995)—is also distinguishable. *First, Itoba* is not a Section 14(e) case at all; it concerned claims under Section 10(b) of the '34 Act and Rule 10b–5. *Id.* at 121. *Second, Itoba* involved a charge of material misrepresentation and nondisclosure in connection with filings that the defendant had made in the United States with the SEC and upon which the plaintiff had affirmatively relied in acquiring the defendants' ADRs on a United States stock exchange. *Id.* at 122. None of those factors is present here.

91. In particular, since Labatt's shares are not traded in the United States, since there are no Labatt ADRs in this country and since the LBT tender offer is explicitly not open to U.S. shareholders, "it was impossible for [U.S. persons] to rely on any alleged deception in making the [unavailable] decision to tender or not". *Panter,* 646 F.2d at 283. Because "no reliance was possible under any imaginable set of facts, such a presumption would be illogical in the extreme". *Lewis,* 619 F.2d at 195.

92. For all the reasons discussed above, Labatt has failed to establish a likelihood of success on the issue of whether this Court has jurisdiction to consider Labatt's claims under Section 14(e). Indeed, the likelihood is that no such jurisdiction exists.

93. Moreover, even if there were jurisdiction in this case under Section 14(e), Labatt would still not be entitled to the relief it seeks. That is because Labatt has failed to offer any evidence of false or misleading information communicated by defendants into the United States or of material information that defendants have failed to disclose.

■ 94. Labatt's position rests on the argument that LBT's decision not to follow the reporting requirements of Section 14(d) of the '34 Act—conduct that Labatt concedes was perfectly legal because its shares are not registered in the United States—somehow operates as a "fraud" under Section 14(e). That argument is untenable. LBT cannot have committed "fraud" in violation of Section 14(e) by not doing what Section 14(d) expressly does not require it to do. *See, e.g.,*

*S–G Securities, Inc. v. Fuqua Inv. Co.*, 466 F.Supp. 1114, 1128 (D.Mass.1978).

95. "[N]o case has relaxed the requirement that fraud, deception or manipulation be alleged or shown" before injunctive relief can be issued under the antifraud provisions of the U.S. securities laws. *Christophides v. D.A. Porco*, 289 F.Supp. 403, 406 (S.D.N.Y. 1968). Labatt's failure of proof on this score is fatal to its motion. *See, e.g., Avnet, Inc. v. Scope Indus.*, 499 F.Supp. 1121, 1128–29 (S.D.N.Y.1980).

*Labatt's Claim Under Section 10(b) of the '34 Act and Rule 10b–5.*

96. Labatt has failed to establish the likelihood of success on its claim under Section 10(b) of the '34 Act and Rule 10b–5.

97. In general, only defrauded investors who have actually purchased or sold the securities in question can maintain claims under Section 10(b) or Rule 10b–5. *E.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 754–55, 95 S.Ct. 1917, 1934–35, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461, 464 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). Labatt concededly is not a purchaser or seller of securities here. Accordingly, Labatt lacks standing to assert its Section 10(b) and Rule 10b–5 claim.

98. The fact that Labatt is seeking only injunctive relief does not, in the circumstances of this case, create an exception to the rule of *Blue Chip Stamps* and *Birnbaum*. In a tender offer, where "[t]here is an admitted fight for control of plaintiff between the defendants and entrenched management", the target is not "a disinterested party protecting merely the markets and its shareholders from fraudulent acts". *GAF Corp. v. Milstein*, 324 F.Supp. 1062, 1072–73 (S.D.N.Y.), *aff'd in relevant part*, 453 F.2d 709, 721–22 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). In such a situation, as this Court explained in *GAF* in language equally applicable here, the remedy of injunctive relief under Section 10(b) or Rule 10b–5 is not available to the target:

"A clear self-interest on the part of the moving parties takes such a controversy beyond the rationale which explains the corporation's vicarious standing to sue for an injunction, viz., an additional means of disinterested protection of the market place and of the stockholders' best interests. . . .

"Even if an issuer would otherwise be accorded standing to sue under Rule 10b–5, when management control as well as the integrity of the markets are sought to be conserved at the same time by the same prime movers, the conflicting interests dictate that the embattled management should not use the equitable assistance afforded by injunction to insure fair and free markets. It is generally inappropriate to impede a legitimate fight for the control of the management of a corporation. . . . [W]here the record is clear that there is a control fight, as the parties here concede, no hearing is needed to invoke the therapeutic rule that a conflict of interest will not be sanctioned by according to the management a standing to sue under Rule 10b–5 where the corporation's own interests are not at stake." 324 F.Supp. at 1072–73.

99. Each time a court in this Circuit has addressed the question in the context of a tender offer, it has denied the target standing to seek a preliminary injunction under Section 10(b) and Rule 10b–5. *E.g., Freedom Nat'l Bank of New York v. Daniels & Bell, Inc.*, 528 F.Supp. 680, 681 (S.D.N.Y.1981); *Raybestos–Manhattan, Inc. v. Hi–Shear Indus.*, 503 F.Supp. 1122, 1134 (E.D.N.Y.1980) ("it would be senseless to allow target management to wield [Rule 10b–5] as a weapon in takeover bids"); *Standard Metals Corp. v. Tomlin*, 503 F.Supp. 586, 600 (S.D.N.Y.1980) (the "Second Circuit has steadfastly refused to extend the reach of Rule 10b–5 to give standing to an issuer"); *Treadway Cos. v. Care Corp.*, [1979–80 Decisions] Fed.Sec. L.Rep. (CCH) ¶ 97,139, at 96,289, 1979 WL 6844 (S.D.N.Y.1979) ("a substantial question exists as to the [target's] standing to seek injunctive relief" under Section 10(b) and Rule 10b–5).

100. *Brascan Ltd. v. Edper Equities Ltd.,* 477 F.Supp. 773 (S.D.N.Y.1979), the one case relied upon by Labatt in support of its assertion of standing, is not to the contrary. *Brascan* did not involve a tender offer. Instead, the issuer was challenging statements by the defendants in connection with a transaction that was held not to be a tender offer. *Id.* at 792–93. Moreover, in ultimately concluding that no fraud had been established by the plaintiff and that therefore a permanent injunction was not warranted, the court warned against using injunctions in corporate control contests, quoting Judge Friendly's statement that, when faced with a request by an issuer "to enjoin 'manipulation of its stock, . . . courts must act both with speed and with caution lest such actions become vehicles for management to thwart' events which may be in the true interests of stockholders". *Id.* at 793–94 (quoting *General Time Corp. v. Talley Indus.,* 403 F.2d 159, 164 (2d Cir.1968)). That concern is the very reason why targets—like Labatt—in battles for corporate control lack standing under Section 10(b) and Rule 10b–5.

■ 101. In addition, for the same reasons that Labatt has failed to show a likelihood of success on the merits of its fraud claims under Section 14(e), it has failed to show a likelihood of success on the merits of its claim under Section 10(b) and Rule 10b–5. Even if an exception to the standing rule of *Blue Chip Stamps, Birnbaum* and *GAF* were to apply here, Labatt has neither pleaded nor presented any evidence of specific misrepresentations or nondisclosures by defendants to Labatt's U.S. shareholders. That failure of proof is fatal.

*Irreparable Injury.*

■ 102. There is "an unmistakably clear requirement in this Circuit that movants for equitable relief must show irreparable harm, non-compensable in money damages, in all circumstances in which an injunction is requested. The requirement of irreparable harm has been consistently maintained by the Second Circuit to date." *Iavarone v. Raymond Keyes Assocs.,* 733 F.Supp. 727, 731 (S.D.N.Y.1990) (citation omitted); *see also Ryan v. VHA Enters.,* No.

90 Civ. 2656, 1990 WL 58969, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,224 (S.D.N.Y. May 1, 1990); *Schmidt v. Enertec Corp.,* 598 F.Supp. 1528, 1543–44 (S.D.N.Y. 1984).

103. Labatt has presented no evidence that would establish irreparable harm. Instead, it relies on the argument that under *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir. 1973), an injunction is the preferred remedy when a tender offeror violates the disclosure requirements of Section 14(e).

104. *Sonesta International Hotels,* however, does not change the rule that the moving party must satisfy the general standards for a preliminary injunction, as set forth by the Second Circuit in *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70 (2d Cir.1979). Indeed, "[c]ases like Sonesta, decided before Jackson Dairy, are of only limited value in determining whether the issuance of an injunction is appropriate in post-Jackson Dairy cases". *Ryan,* 1990 WL 58969, at *5. As the court explained in *Schmidt, supra:*

> "Under Jackson Dairy, supra, that standard requires that the moving party make an independent showing of irreparable injury. . . . [P]laintiffs must identify specific injuries resulting from a continuation of the Exchange Offer in its present form for which a monetary award or other legal remedy would not adequately compensate them." 598 F.Supp. at 1543–44.

105. By failing to present any evidence on irreparable harm, Labatt has failed to satisfy its burden under *Jackson Dairy.*

■ 106. Moreover, any harm to Labatt's U.S. shareholders resulting from their purchases and sales of Labatt stock on the open market would be compensable by money damages in an action at law brought by the shareholders themselves. That, in itself, is sufficient to deny Labatt's motion. *Plessey,* 628 F.Supp. at 499–500; *Gearhart Indus. v. Smith Int'l Inc.,* 741 F.2d 707, 716 (5th Cir.1984); *Iavarone,* 733 F.Supp. at 732.

*Balance of Hardships.*

107. The balance of hardships tips in favor of defendants and Labatt's non-U.S. shareholders and against the grant of injunctive relief. LBT is entitled to conduct its wholly Canadian business transaction pursuant to Canadian law and regulations. Granting Labatt the relief it seeks would superimpose another—potentially inconsistent—regulatory scheme on the transaction at the eleventh hour and would seriously jeopardize LBT's lawful tender offer.

108. Similarly, Canadian shareholders have a right and reasonable expectation that this entirely Canadian transaction go forward on the time frame established by Canadian law. The injunction sought by Labatt would deprive its non-U.S. shareholders of the timely payment of C$2.3 billion dollars to which they are entitled under Canadian law and could deny them the opportunity to realize a premium on the tender of their shares.

109. These are serious potential hardships that are not outweighed by any identified injury to or burden on Labatt or its U.S. shareholders. As the court stated in *Hiram Walker*, at 3–4, an injunction "would certainly raise the possibility of compromising the tender offer altogether by the delay that would be entailed. It would inflict an injury on Canadian shareholders who might wish to avail themselves of this tender offer". The same is true here.

*Comity and the Public Interest.*

110. Canadian interests predominate in this wholly Canadian transaction. The companies are Canadian, their stock is registered and traded only in Canada, they are subject to and comply with Canadian (but not U.S.) reporting requirements, they are involved in an entirely Canadian tender offer, the target's shareholders are overwhelmingly Canadian and U.S. shareholders are not eligible to participate. As the Second Circuit has stated, there is "no reason to extend [jurisdiction] to cases where the United States activities ... are relatively small in comparison to those abroad". *Bersch v. Drexel Firestone Inc.*, 519 F.2d 974, 987 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975).

111. Furthermore, Canada is "a sister common law jurisdiction with procedures akin to our own". *Clarkson Co. v. Shaheen*, 544 F.2d 624, 630 (2d Cir.1976). Labatt concedes that any questions regarding the validity of LBT's Offer can be—and are currently being—fully and fairly addressed under Canadian law by Canadian authorities. Therefore, exercise of jurisdiction by this Court is not necessary to provide a forum in which to resolve issues that might arise in connection with the Offer. *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944, 952 (1st Cir.1991) (Breyer, J.), *cert. denied*, 502 U.S. 1095, 112 S.Ct. 1172, 117 L.Ed.2d 418 (1992). As the court in *Plessey* concluded:

> "The public interest surely supports as little intervention as possible by a foreign government (in this case, our own) in order not to upset the considered decision of the [foreign] government concerning how it should run its own affairs." 628 F.Supp. at 501.

112. Finally, "there are serious concerns as to whether the Williams Act is implicated here. The conclusion must, therefore, be reached that the public interest concern in enforcement of the Williams Act should not be given considerable weight". *Plessey*, 628 F.Supp. at 501. In such circumstances, abstention on the ground of international comity is the appropriate course.

113. Labatt has failed to demonstrate a likelihood of success on the merits of either its Section 14(e) claims or its Section 10(b) and Rule 10b–5 claim. On the showing that Labatt has made, this Court's jurisdiction over the Rule 14(e) claims is doubtful, as is Labatt's standing to assert the Section 10(b) and Rule 10b–5 claim. Moreover, Labatt has failed to demonstrate a likelihood that it could establish material misrepresentations on any of its claims.

114. In addition, Labatt has failed to present evidence showing that the balance of hardships tips decidedly in favor of issuing an injunction. If anything, the balance tips in favor of defendants and Labatt's non-U.S. shareholders.

115. Finally, considerations of public welfare and international comity militate against issuance of an injunction in this case.

116. Labatt's application for a preliminary injunction should be and is denied.

The foregoing shall constitute the Findings of Fact and Conclusions of Law in pursuance of Rule 52(a), Fed.R.Civ.P.

**SO ORDERED.**